George **KIRACOFE, M.D., Appellant**
**(Plaintiff Below),**

v.

**REID MEMORIAL HOSPITAL, Appellee**
**(Defendant Below).**

No. 1–383 A 77.

Court of Appeals of Indiana,
First District.

April 11, 1984.

Gregory F. Hahn, David J. Cutshaw, Dillon, Hardamon & Cohen, Indianapolis, for appellant.

Ralph A. Cohen, Myra C. Selby, Ice, Miller, Donadio & Ryan, Indianapolis, George R. Reller, Reller, Mendenhall, Kleinknecht & Milligan, Richmond, for appellee.

ROBERTSON, Judge.

George Kiracofe, M.D. (Kiracofe) appeals the judgment upholding Reid Memorial Hospital's (hospital) suspension and termination of Kiracofe's privileges to practice medicine at the hospital.

We affirm.

Kiracofe is a licensed physician practicing medicine in Richmond, Indiana, and specializes in family practice. Most of his patients reside in the area. Reid Memorial Hospital is a general hospital and is organized as a not-for-profit corporation. The hospital has a Board of Trustees consisting of twenty-one members, with one member being appointed by each of the following governmental organizations: Richmond City Council, Wayne County Council, Wayne Township Trustees, and Wayne County Commissioner. The hospital receives tax support from the state and county and it also participates in programs with federal funding.

Kiracofe was initially admitted to the medical staff of the hospital in 1975 with privileges in family practice. His history at the hospital has been replete with the filing of approximately ten unusual occurrence reports. Some of the reports have resulted in disciplinary action being taken against Kiracofe. The reports were initiated because of Kiracofe's refusal to explain orders to nurses, abusive behavior towards

nurses who questioned his orders, entering inappropriate and defamatory statements in medical records, failure to complete medical records in a timely fashion, and giving orders which were inappropriate and potentially harmful. These incidents led the medical staff to require Kiracofe to obtain counseling, to his censure, and to a recommendation to suspend his privileges.

Kiracofe's privileges were placed on probation by the medical staff in January, 1981. His privileges were limited and his work was subject to scrutiny by the officers of the medical staff and the family practice section. Additionally, the terms of his probation also required Kiracofe to undergo psychiatric counseling and evaluation from a psychiatrist approved by the Executive Committee of the medical staff.

Kiracofe was summarily suspended by the hospital's Chief of Staff for his treatment of a fourteen year old patient. Kiracofe admitted the girl into the hospital on January 21, 1982, with a diagnosis of pelvic inflammatory disease (PID). The diagnosis was not substantiated by the laboratory tests, nor did the tests indicate the presence of disease or infection. Moreover, the probability of the existence of PID in a fourteen year old girl is extremely unlikely. Kiracofe ordered the patient be treated with several antibiotics. The Chief of Family Medicine questioned the hospitalization of the girl because her charts indicated that the treatment was not working and her hospitalization was quite extended. He requested Kiracofe obtain consultation, which Kiracofe initially refused.

The consulting physician examined the patient and concluded that her problems were primarily emotional. He recommended against the use of antibiotics. Kiracofe continued to treat her for PID and prescribed Piperocil, an extremely strong antibiotic. This order was questioned and the Chief of the Medical Staff requested a consultation with Kiracofe. Kiracofe met with the Chief of Staff, who demanded Kiracofe turn over treatment to another doctor on March 2, 1982. Kiracofe requested that the antibiotic be continued. Kira-

cofe was summarily suspended by the Chief of Staff that day and he filed formal charges against Kiracofe that day.

The Executive Committee met to review the suspension on March 9, 1982, and hear evidence on behalf of Kiracofe. The Committee received Kiracofe's personal file which included a chronological summary of past grievances against Kiracofe. The Committee upheld the suspension and voted to terminate Kiracofe's privileges. Kiracofe appealed this recommendation to the Ad Hoc Committee, which voted to uphold the suspension and termination. Kiracofe then appealed to the Appellate Review Committee, which affirmed the termination. The Board of Directors subsequently upheld the actions of these committees.

Kiracofe initiated the lawsuit. The trial court found that Kiracofe failed to establish a nexus between the suspension and termination by the hospital and the government involvement or functions. It also found there was evidence consisting of Kiracofe's past record and his current treatment to support Kiracofe's suspension and termination. It held that the hospital's actions were not unlawful, arbitrary or capricious, and entered judgment in favor of the hospital.

The primary issue Kiracofe presents for review is whether he was entitled or accorded due process prior to his suspension and termination of his privileges. He raises numerous preliminary issues regarding due process which will be combined in this opinion for purposes of clarity. The thrust of Kiracofe's argument is that the hospital has become a public institution such that its actions constitute state action. Kiracofe alleges the state has insinuated itself into a position of interdependence with the hospital so as to become a joint participant with the hospital. Kiracofe raises other issues regarding the procedures which will also be discussed.

■ The Due Process Clause of the Fourteenth Amendment applies to state action, but it offers no shield against private conduct regardless of how wrongful such conduct may be. *Renforth v. Fayette Me-*

*morial Hospital Association, Inc.,* (1978) 178 Ind.App. 475, 383 N.E.2d 368, *cert. denied,* 444 U.S. 930, 100 S.Ct. 273, 62 L.Ed.2d 187; *Jackson v. Metropolitan Edison Co.,* (1974) 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477. Kiracofe argues the hospital is a public institution, thus, he was entitled to due process prior to his suspension and termination of his privileges.

Kiracofe argues the following facts establish that the hospital is a public institution: the hospital's Board of Directors consists of twenty-one members, four of which are appointed by the Richmond City Council, the Wayne County Council, the Wayne Township Trustee, and the Wayne County Commissioners; the legal title to the land upon which the hospital rests is held by the City of Richmond; the hospital receives federal, state, county, and township funds; the hospital is subject to extensive state regulation; it is the best staffed and best equipped hospital in the area, such that it has a monopoly in the area; the hospital receives tax revenues from Wayne County; and the hospital's bylaws contain a statement that it is owned by the people of Richmond.

In *Renforth v. Fayette Memorial Hospital Association, Inc., supra,* we rejected the arguments that a hospital was a public institution because it had members of its Board of Directors appointed by local governmental units, because the hospital enjoyed a monopoly position, and because it received public funds and tax revenues. This court held that in order to find state action, one must establish a nexus between the governmental involvement and the particular activity being challenged.

■ The fact that a business or industry is heavily regulated does not convert the business or industry into a public institution. In *Jackson v. Metropolitan Edison Co., supra,* the Supreme Court stated:

The mere fact that a business is subject to extensive state regulation does not by itself convert its action into that of the state for purposes of the Fourteenth Amendment. Nor does the fact that the regulation is extensive and detailed, ...,

do so ... 419 U.S. 351–352, 95 S.Ct. 453–354.

We also fail to see what significance the statement in the bylaws has to do in this case.

Kiracofe argues *Renforth* is distinguishable because the legal title to the land on which the hospital is situated is held by the City of Richmond. He argues this case is controlled by *Burton v. Wilmington Parking Authority,* (1961) 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45.

In *Burton,* the operator of a private restaurant, which leased space in a building which was financed by public funds and owned by the public parking authority, refused to serve a customer solely because he was a Negro. The Supreme Court reversed the opinion of the Supreme Court of Delaware which held the restaurant acted in a purely private capacity. The Supreme Court held there was state action because the public parking authority had "insinuated itself into a position of interdependence with Eagle [the restaurant] that it must be recognized as a joint participant ..." Kiracofe argues that state action should be found in the present case because the title to the land is held by the City of Richmond. He also argues the state has insinuated itself into a position of interdependence.

The Supreme Court also limited its opinion in *Burton* with the following language:

Because readily applicable formulae may not be fashioned, the conclusions drawn from the facts and circumstances of this record are no means declared as universal truths on the basis of which every state leasing arrangement is to be tested. Owing to the very "largeness" of government, a multitude of relationships might appear to fall within the Amendment's embrace, but that, it must be remembered, can be determined only in the framework of the peculiar facts and circumstances present. 365 U.S. 725, 81 S.Ct. 862.

Other cases interpreting *Burton* have limited its holding.

*Doe v. Bellin Memorial Hospital,* (7th Cir.1973) 479 F.2d 756, involved an appeal by a woman seeking an abortion at a private hospital which received federal funds. The hospital denied the woman and her doctor the use of its facilities. She alleged the decision violated her right to have an abortion pursuant to *Roe v. Wade,* (1973) 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147. The opinion held *Burton* was distinguishable because there was no evidence that the state sought to influence the hospital decisions or policies either through direct regulation or discriminatory application of its powers or its benefits.

 In order to recover, Kiracofe must establish "a sufficiently close nexus between the state and the challenged activity of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Jackson v. Metropolitan Edison Co., supra,* 419 U.S. at p. 351–352, 95 S.Ct. at 453–454. Kiracofe has argued *Renforth* is not applicable because of *Burton.* However, it is *Burton* which is distinguishable from the present case because there is no lease between the hospital and the City and racial discrimination is not involved. Similar to *Doe v. Bellin Memorial Hospital, supra,* Kiracofe has failed to show that the state sought to influence the hospital's decision to terminate his privileges through the various factors previously discussed. Thus, he has failed to establish the nexus between the state and the challenged activity as required by *Renforth.* · The trial court properly concluded there was no state action and therefore, Kiracofe was not entitled to due process.

 In a similar argument, Kiracofe again relies upon *Burton* to allege the state has "so insinuated itself to a position of interdependence" with the hospital, "that the state must be recognized a joint participant in the hospital's activities. *Burton v. Wilmington Parking Authority, supra,* 365 U.S. at 725, 81 S.Ct. at 862. The factual distinctions between *Burton* and the present case do not support Kiracofe's argument. In *Burton,* the building was built and operated by the public parking authority. Approximately seventy percent of its expected revenue was to come from commercial leases and sixty percent of the building's space was allocated to commercial leases. The commercially leased areas constituted "a physically and financially integral and, indeed, indispensable part of the state's plan to operate its project". *Id.* at 723–724, 81 S.Ct. at 860–861. We remain unpersuaded that the present case is controlled by *Burton,* or that the state must be recognized as joint participant in the hospital's decision to terminate Kiracofe's staff privileges because there is no similar state plan or a showing that the hospital's services are indispensable to the state.

 Kiracofe was not entitled to due process because there was no state action and the state was not a joint participant in the activities of the hospital. The standard of review in cases where a private hospital dismisses a physician has recently been addressed in *Yarnell v. Sisters of St. Francis Health Services,* (1983) Ind.App., 446 N.E.2d 359. Generally, a hospital can exclude a licensed physician from its staff without being subject to a judicial review. When a hospital is determining whether to reappoint a physician to its medical staff, the decision is subject to the limited judicial review of whether the hospital administration adhered to the procedures contained in the bylaws. Where the hospital follows the procedures in its bylaws, any decision reached by the hospital board shall not be subject to judicial review. *Id.*

Kiracofe argues the trial court erred in its determination that the hospital complied with its bylaws. He asserts the summary suspension was improper because the life or health of the patient was not endangered and that the bylaws merely require a physician to substantiate his diagnosis and treatment of a patient. Kiracofe also contends the trial court erred in this determination because he had been placed on probation by the hospital and there was no provision for probationary status in the bylaws.

▮▮ Although the bylaws do not contain a provision for probation, the trial court did not err in its determination that the hospital complied with its bylaws. The facts reveal Kiracofe agreed to probation and agreed to undergo counseling as a condition of probation. If Kiracofe had an objection to this probationary status, he should have raised it before he agreed to be bound by it. His argument is waived. A hospital has the right to take reasonable measures to protect itself and its patients. *Renforth v. Fayette Memorial Hospital Ass'n., Inc., supra.* We also fail to see what harm Kiracofe suffered as a result of his probation because the probation merely extended his privileges.

▮▮▮ Kiracofe also alleges the trial court erred by determining the hospital complied with its bylaws in terminating him because the bylaws require the life or health of a patient be endangered and that the physician has to substantiate his diagnosis and treatment. Kiracofe argues that he substantiated the possibility of PID and that the patient's life was not threatened. This argument is a request to reweigh the evidence. In determining whether a judgment is supported by sufficient evidence, this court neither weighs the evidence nor resolves questions of credibility, but rather reviews only that evidence most favorable to the appellee, together with all logical inferences flowing therefrom. It is only where the evidence leads to but one conclusion and the trial court has reached the opposite conclusion that its decision will be disturbed as being contrary to law. *Cook v. Rosebank Development Corp.,* (1978) 176 Ind.App. 664, 376 N.E.2d 1196.

▮▮ There was evidence before the various committees of the hospital showing that Kiracofe was treating the patient with extremely potent antibiotics for a very low grade fever. The patient was hospitalized for forty-one days for problems which other physicians considered to be psychosomatic. During her hospitalization, the patient made very little improvement. The evidence was sufficient to support a determination the patient's health was being threatened by the continuation of Kiracofe's treatment.

▮▮ Kiracofe also argues that he substantiated the possibility of PID. Difficulty arises with this issue because PID is hard to detect. However, there were medical opinions from other physicians which considered PID to be a very remote possibility in a girl of this age. Kiracofe's tests did not substantiate the presence of this disease or did his treatments produce any noticeable results. There was sufficient evidence to support the committees' and the trial court's determination.

▮▮ Kiracofe alleges it was error for the committees to review his personal file which contained his record of previous occurrences. He argues that he did not have notice that his record would be before the committees. Both the letter from the Chief of Staff and a memorandum to the Executive Committee make reference to Kiracofe's probation and his past behavior. Kiracofe acknowledged receiving both documents and that they made references to his past record. Although the letter and memorandum are not models of draftmanship for giving notice, they were sufficient to apprise Kiracofe that his past record was subject to review because he was on probation.

▮▮ Kiracofe also alleges the committees were unduly prejudiced by the Chief of Staff and other committee members. He infers that these individuals lobbied against him and that the various committees' decisions were the result of petty personality conflicts. It must be noted that this argument, as well as the last issue, are due process arguments and Kiracofe did not have any rights to due process because no state action was involved. Furthermore, we have already held there was sufficient evidence to support his suspension and termination of privileges. The decision of a hospital concerning staff privileges is accorded great deference and judicial intervention is limited to an assessment of whether the procedures employed by the hospital are fair, whether the standards set

by the hospital are reasonable, and whether they have been applied without arbitrariness and capriciousness. A physician must demonstrate actual bias in order to disqualify an administrative tribunal. *Laje v. R.E. Thomason General Hospital* (5th Cir.1977) 564 F.2d 1159.` Kiracofe has not demonstrated actual prejudice.

■ Kiracofe alleges the trial court erred by excluding the testimony of another patient who he had treated for PID. The hospital objected to this testimony as being irrelevant and that the witness was not competent to give medical testimony. The trial court correctly sustained this objection. Her testimony would have merely shown that Kiracofe treated her properly but it would have been irrelevant to his case of the fourteen year old patient or to Kiracofe's record and probationary status.

■ Kiracofe alleges the trial court erred by not applying IND.CODE 16–12–23–1, which provides that hospitals supported by county funds are open to all taxpayers and licensed physicians of their choice. This statute includes the language "the provisions of this act shall not deprive the governing board of such a hospital of the right to adopt and enforce reasonable rules and regulations concerning the use of such hospitals and its facilities by such physicians". In the present case, the hospital granted Kiracofe privileges to use its facilities for approximately eight years prior to terminating his privileges because he failed to adhere to its rules and regulations. The hospital's rules and regulations were reasonable. Whatever error may have been committed by the trial court was harmless.

Kiracofe's final allegation of error is that the evidence was insufficient to justify the suspension and termination of his privileges and that the hospital's actions were arbitrary and capricious. This issue has been resolved adversely to Kiracofe by our determination that the hospital complied with its bylaws. We will neither reweigh the evidence nor burden this opinion with a repetition of the facts.

The judgment is affirmed.

NEAL, P.J., concurs.

RATLIFF, J., concurs with opinion.

RATLIFF, Judge, concurring.

I concur in the result reached by the majority in this case. In my view, the record amply supports the hospital's termination of Dr. Kiracofe's hospital privileges. Upon the facts of this case, the actions of the hospital clearly were not arbitrary, capricious, or unreasonable. Good reason for the termination of hospital privileges clearly was shown. Further, Dr. Kiracofe was afforded sufficient due process rights by way of a hearing before the Executive Committee, the Ad Hoc Committee, and the Appellate Review Committee. Therefore, the termination of hospital privileges here was done fairly and legally. However, I find some of the statements made by the majority to be troublesome and disturbing to the conscience. Because of the possible impact of the majority opinion upon future cases, I feel compelled to state my reservations and to indicate what I believe to be a better rule for such cases.

I agree with the majority that Dr. Kiracofe had no Fourteenth Amendment due process rights because of the lack of any governmental involvement in the action taken by a private hospital. Our decision in *Renforth v. Fayette Memorial Hospital Association, Inc.,* (1978) 178 Ind.App. 475, 383 N.E.2d 368, *trans. denied* (1979), *cert. denied* 444 U.S. 930, 100 S.Ct. 273, 62 L.Ed.2d 187, establishes this point. However, for reasons which I shall develop, the fact that a physician has no due process rights under the Fourteenth Amendment to the Constitution of the United States applicable to the decisions of a private hospital in its action denying or suspending his hospital privileges does not necessarily mean the physician has no rights in the nature of due process in such situations. In fact, it is significant that in *Renforth*, the physician was afforded such rights to the extent

that he was granted hearings and opportunities to make his position known. Again, in *Yarnell v. Sisters of St. Francis Health Services, Inc.*, (1983) Ind.App., 446 N.E.2d 359, this court observed that "the [h]ospital in this instance went further than what was required by its bylaws to afford appellant due process." 446 N.E.2d at 363.

It appears to me that the majority here and this court in *Renforth* are following the rule that granting or denying physicians hospital privileges by private hospitals is discretionary with the governing authority of that hospital. This rule finds support in several decisions. *See e.g., Moore v. Andalusia Hospital, Inc.*, (1969) 284 Ala. 259, 224 So.2d 617; *Monyek v. Parkway General Hospital, Inc.*, (1973) Fla.App., 273 So.2d 430; *Bello v. South Shore Hospital*, (1981) 384 Mass. 770, 429 N.E.2d 1011; *Cowan v. Gibson*, (1965) Mo., 392 S.W.2d 307; Annot., 37 A.L.R.3d 645, 659–61 (1971). Such rule has been said to be the general rule. *Cowan.*

On the other hand, it has been held that a private hospital's action in granting or denying medical staff privileges is not completely discretionary, but is subject to some judicial control. *See e.g., Greisman v. Newcomb Hospital*, (1963) 40 N.J. 389, 192 A.2d 817, perhaps the leading case in this area, and *Reiswig v. St. Joseph's Hospital & Medical Center*, (1981) 130 Ariz. 164, 634 P.2d 976; *Garrow v. Elizabeth General Hospital & Dispensary*, (1979) 79 N.J. 549, 401 A.2d 533; *Guerrero v. Burlington County Memorial Hospital*, (1976) 70 N.J. 344, 360 A.2d 334; *Davidson v. Youngstown Hospital Association*, (1969) 19 Ohio App.2d 246, 250 N.E.2d 892; Annot., 37 A.L.R.3d at 661–66. These cases point out that the so-called "private hospitals" are private only in the sense that they are not governmental entities, but that, in reality, such hospitals are at least quasi-public institutions. In making that distinction, those courts have focused upon the facts that such hospitals often receive public funds, patient's bills are paid by Medicare and other public supported programs, the hospitals receive tax exemptions, and the overriding public interest in the health ser-

vices industry. And, particularly where, as here, the hospital is the only hospital in the community, its economic impact is great, and the denial of hospital privileges, in many cases, is tantamount to denying a physician the opportunity to practice his or her chosen profession. These considerations were best stated by the New Jersey Supreme Court in *Greisman*, where it said of such hospitals:

"They are private in the sense that they are nongovernmental but they are hardly private in other senses. Newcomb is a nonprofit organization dedicated by its certificate of incorporation to the vital public use of serving the sick and injured, its funds are in good measure received from public sources and through public solicitation, and its tax benefits are received because of its nonprofit and nonprivate aspects.... It constitutes a virtual monopoly in the area in which it functions and it is in no position to claim immunity from public supervision and control because of its allegedly private nature. Indeed, in the development of the law, activities much less public than the hospital activities of Newcomb, have commonly been subjected to judicial (as well as legislative) supervision and control to the extent necessary to satisfy the felt needs of the times. [Citations omitted.]"

40 N.J. at 396, 192 A.2d at 821.

The New Jersey Supreme Court in *Greisman* went on to say that the power to select a medical staff is a fiduciary power to be exercised reasonably and for the public good. The court observed further:

"The Newcomb Hospital is the only hospital in the Vineland metropolitan area and it is publicly dedicated, primarily to the care of the sick and injured of Vineland and its vicinity and, thereafter to the care of such other persons as may be accommodated. Doctors need hospital facilities and a physician practicing in the metropolitan Vineland area will understandably seek them at the Newcomb Hospital. Furthermore, every patient of his will want the Newcomb Hospital fa-

cilities to be readily available. It hardly suffices to say that the patient could enter the hospital under the care of a member of the existing staff, for his personal physician would have no opportunity of participating in his treatment; nor does it suffice to say that there are other hospitals outside the metropolitan Vineland area, for they may be too distant or unsuitable to his needs and desires. All this indicates very pointedly that, while the managing officials may have discretionary powers in the selection of the medical staff, those powers are deeply imbedded in public aspects, and are rightly viewed, for policy reasons entirely comparable to those expressed in *Falcone* [*v. Middlesex Co. Medical Soc.,* (1961) 34 N.J. 582, 170 A.2d 791] as fiduciary powers to be exercised reasonably and for the public good.

. . . .

Hospital officials are properly vested with large measures of managing discretion and to the extent that they exert their efforts toward the elevation of hospital standards and higher medical care, they will receive broad judicial support. But they must never lose sight of the fact that the hospitals are operated not for private ends but for the benefit of the public, and that their existence is for the purpose of faithfully furnishing facilities to the members of the medical profession in aid of their service to the public. They must recognize that their powers, particularly those relating to the selection of staff members, are powers in trust which are always to be dealt with as such. While reasonable and constructive exercises of judgment should be honored, courts would indeed be remiss if they declined to intervene where, as here, the powers were invoked at the threshold to preclude an application for staff membership, not because of any lack of individual merit, but for a reason unrelated to sound hospital standards

and not in furtherance of the common good." [1]

40 N.J. at 402–04, 192 A.2d at 824–25.

All of the facts alluded to in *Greisman* are present here. *Reid Memorial Hospital* is the only hospital in the community; it receives public funds; it has a monopoly in its area; it is tax-exempt; denial of staff privileges would have a devastating economic impact upon a physician in the Richmond area and would interfere seriously with his right to practice his profession in that community.

Other decisions have made similar observations:

"A non-profit hospital serving the public generally is a quasi-public institution whose obligation to serve the public is the linchpin of its public trust and the fiduciary relationship which arises out of that trust.

. . . .

When a hospital's board of trustees or directors is in the process of determining whether a doctor should be admitted to its staff, the hospital's public trust is directly involved in view of the public's interest in the quality and availability of medical service. The board, of course, has an interest in preserving its autonomy and in maintaining control over the quality of its staff. Additionally, doctors, particularly surgeons, have a substantial interest in favorable responses to their applications for staff membership, for their ability to pursue their profession may depend on the availability of necessary hospital facilities. [Citations omitted.]"

*Garrow,* 79 N.J. at 557, 401 A.2d at 537.

"Fundamental fairness dictates that the hospital apprise the physician of the specific charges and that the applicant be afforded the opportunity to appear and present witnesses and material in support of his position and to contradict or explain the bases asserted for the proposed denial. Such hearings in addition

---

1. *Greisman* involved a hospital bylaw which would admit only persons holding the degree of Doctor of Medicine to the hospital medical staff, thus effectively denying hospital privileges to doctors of osteopathy even though they held unlimited licenses to practice medicine.

to affording the doctor an opportunity to respond to charges enable a hospital to make 'an intelligent and reasonable judgment in good faith upon all the facts presented. [Citations omitted.]' "

*Id.* at 564, 401 A.2d at 541.

The *Garrow* court also determined that the physician-applicant was entitled to counsel at the hearing. Further, the court asserted that the board's findings and conclusions will not be upheld if arbitrary and capricious. "Its conclusions must be founded on reasonable and sensible grounds." *Id.* at 565, 401 A.2d at 541. *Garrow* declared that "[j]udicial review of the hospital board's action should properly focus on the reasonableness of the action taken in relation to the several interests of the public, the applicant, and the hospital." *Id.*

The majority here declares that a hospital can exclude a physician from its staff without being subject to a judicial review. Majority opinion at 1139. Obviously, this is following the discretionary rule. The majority then states:

"When a hospital is determining whether to reappoint a physician to its medical staff, the decision is subject to the limited judicial review of whether the hospital administration adhered to the procedures contained in the bylaws. Where the hospital follows the procedures in its bylaws, any decision reached by the hospital board shall not be subject to judicial review. [*Yarnell*]."

Majority opinion at 1139.

The trouble with the above quoted language and the language in *Yarnell* upon which it is based is that no concern is given to the reasonableness of the bylaws or the reasons for the denial of reappointment. Thus, so long as the hospital board followed the procedures specified in its bylaws it could terminate a physician's staff privileges for reasons having no connection with the interests of the public, the applicant, and the hospital, and which bore no relation whatever to the public good. Such a rule should not prevail.

I recognize that this court in *Renforth* rejected the argument that a private hospital was, nevertheless, a public institution. In my judgment that rejection was wrong. We should re-examine our position in the light of the realities of the situation and the factors focused upon in *Greisman* and *Garrow*, and reject our myopic view of the "private" character of the so-called "private hospital," and our blind adherence to the discretionary rule.

Therefore, in my view, if a private hospital is considering suspension or termination of hospital privileges, or denial thereof, to a duly licensed physician practicing within the area served by that hospital, especially where, as here, it is the only hospital reasonably available, that physician should be apprised of the reasons for the contemplated suspension, termination, or denial, and be granted a hearing at which the physician may present testimony or material in support of his position, and at which he is entitled to the benefit of counsel. This hearing need not be formal, but sufficient reasons must be developed for the board's action. If the hospital governing authority acts in a manner which is not arbitrary, capricious, or unreasonable, and its conclusions are founded on reasonable and sensible grounds consistent with the best interests of the public, the physician, and the hospital, and in keeping with the hospital's public trust, the hospital's action will not be disturbed. The right of judicial review must be extended to the physician, however, in order that the actions of the hospital board be kept within allowable bounds.

Here, the actions of the hospital board substantially met the requirements I would impose, and I concur in the decision.