**Elena EZPELETA, M.D., Plaintiff,**

**v.**

**SISTERS OF MERCY HEALTH CORPORATION, a Michigan Corporation, Defendant.**

**No. H 83–143.**

United States District Court,
N.D. Indiana,
Hammond Division.

July 9, 1985.

Robert G. Berger, Highland, Ind., for plaintiff.

George E. Bloom, U.S. Dept. of Justice, Hammond, Ind., David A. Ettinger, Honigman, Miller, Schwartz & Cohn, Detroit, Mich., for defendant.

## ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

KANNE, District Judge.

Before the court is plaintiff's application for preliminary injunction and defendant's motion for summary judgment.[1]

Under FED.R.CIV.P. 56(c), summary judgment may only be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as matter of law." FED.R.CIV.P. 56(c). Thus, summary judgment serves as a vehicle with which the court "can determine whether further exploration of the facts is necessary." *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1975).

In making this determination, the court must draw all inferences from the established or asserted facts in favor of the nonmoving party. *Peoples Outfitting Co. v. General Electric Credit Corp.*, 549 F.2d 42 (7th Cir.1977). However, a party opposing the motion may not rest on the mere allegations of his pleadings or the bare contentions that an issue of fact exists. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.1983), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392–393, 78 L.Ed.2d 336 (1983). *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). *See generally*, C. Wright, *Law of Federal Courts*, § 99 (4th ed. 1983); 6 *Moore's Federal Practice*, § 56.15 (2d ed. 1983).

Even if there are some disputed facts, where the undisputed facts are the material facts involved and those facts show one party is entitled to judgment as a matter of law, summary judgment is appropriate. *Egger v. Phillips*, 710 F.2d 292, 296–97 (7th Cir.1983), *cert. denied*, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983). Further, if the court resolves all factual disputes in favor of the nonmoving party and still finds summary judgment in favor of the moving party is correct as a matter of law, then the moving party is entitled to summary judgment in his favor. *Id.* at 297. *See also, Bishop v. Wood*, 426 U.S. 341, 348 n. 11, 96 S.Ct. 2074, 2079 n. 11, 48 L.Ed.2d 684 (1976).

Finally, the existence of difficult or complicated questions of law without genuine issue of material facts does not prevent a summary judgment. The court will decide the issues raised by the parties in light of these principles.

Turning now to the undisputed facts, plaintiff, Elena Ezpeleta, is a medical doctor whose speciality is anesthesiology. Defendant operates Our Lady of Mercy Hospital (OLM), a small private medical facility located in Dyer, Indiana. Like many hospitals in Indiana it does not employ salaried physicians to perform medical services. The medical staff is made up of independent contractors and their employees. In the case of the anesthesiology department a professional medical corporation, Subur-

---

1. The ruling on these issues was delayed by the court pending the issuance of controlling decision by the Supreme Court and Court of Appeals for the Seventh Circuit.

ban Anesthesia Associates, had an exclusive contract to provide anesthesiology services to OLM during the initial period in which this action arises. While an independent contractor may employ physicians, the right of an individual physician to practice in the hospital is subject to the granting of "staff privileges". Without staff privileges no physician, regardless of his employment with a contract provider, can practice in the hospital. Standards for admission and continued staff membership is determined by the hospital.

Plaintiff was an employee of Suburban Anesthesia Associates and in August of 1981 she was granted probationary staff privileges at OLM.

In 1981 Dr. Richard Markey headed Suburban Anesthesia Associates and hired other doctors, on behalf of the corporation, to practice anesthesiology at OLM. Some of the physicians-employees were also shareholders of the corporation. The plaintiff, however, was a salaried employee only.

In addition to his role with the corporation, Dr. Markey headed the anesthesiology department at OLM from 1965 until his retirement in February of 1982. Under Dr. Markey the anesthesiology department was operated informally without written guidelines. There was no formal work schedule for the anesthesiologists and they would choose or be assigned their cases in the operating room.

In the late 1970's the Joint Accreditation Committee issued a report critical of the anesthesiology department at OLM. Thereafter, the hospital, with the assistance of Dr. Markey, sought to improve and upgrade the anesthesiology department. Eventually, Dr. Markey, who suffered from a heart condition, announced his retirement and a new exclusive provider for anesthesiology services was sought to replace Suburban Anesthesia Associates.

Ultimately the hospital entered into a contract with Dr. Shiree Ahmad. The contract provided that as an independent contractor Dr. Ahmad would have the exclusive right to provide anesthesiology services at OLM either personally or through physicians employed by her. The exception to this exclusive contract was that the plaintiff and another physician with staff privileges (both employees of Suburban Anesthesia Associates) could continue to practice anesthesiology at OLM.

In addition to her exclusive contract with OLM, Dr. Ahmad also became head of the anesthesiology department. As the department head Dr. Ahmad had the authority and responsibility for establishing new policies and procedures. Of particular importance to this case, Dr. Ahmad was responsible for reviewing and evaluating medical abilities of physicians practicing anesthesiology at OLM.

The anesthesiologist department underwent numerous changes. For purposes of this opinion it suffices to say that Dr. Ahmad instituted a much more organized and structured department than had existed under Dr. Markey.

The plaintiff is not board certified in anesthesiology, nor was Dr. Markey. Dr. Markey expressed satisfaction with the plaintiff's medical ability and had intended to eventually offer her ownership rights in Suburban Anesthesia Associates.

Prior to entering into the contract with OLM, Dr. Ahmad had served as an instructor with a large metropolitan teaching hospital, Northwestern University Hospital in Chicago. Dr. Ahmad is board certified and has clinical anesthesiology experience.

During and after the transition in the anesthesiology department at OLM plaintiff continued to have only probationary staff privileges.

In the period of February through April of 1982, Dr. Ahmad formally evaluated plaintiff's work and found it unsatisfactory. In May of 1982 Dr. Ahmad informed plaintiff of the unsatisfactory evaluation. Thereafter, acting on Dr. Ahmad's recommendation, plaintiff was allowed to retain her probationary staff privileges for an additional three months. However, during this three month period Dr. Ahmad's opinion of plaintiff's medical ability and performance did not change.

In August of 1982, Dr. Ahmad recommended to Dr. Cespedes, chairman of the surgery department, that plaintiff should be denied continuation of staff privileges. Dr. Cespedes agreed with Dr. Ahmad, and thereafter Dr. Ahmad's recommendation was presented to and reviewed by various hospital committees consisting of medical personnel and hospital administrators. During these committee proceedings plaintiff defended against Dr. Ahmad's charges that she was medically deficient. Plaintiff personally appeared before one of the committees. She also submitted a written statement. Also near the end of the review process plaintiff had the assistance of legal counsel.

Plaintiff's probationary staff privileges were suspended by the hospital in October of 1982, and in January of 1983 those staff privileges were terminated. The basis for the termination of plaintiff's probationary staff privileges was stated as her poor performance, and, to a lesser degree a misstatement on her application for admission to the hospital staff.

In all, plaintiff held probationary staff privileges at OLM for approximately fourteen months; eight months under Dr. Markey as department head and six months under Dr. Ahmad.

Plaintiff's lawsuit seeks equitable relief in the form of reinstatement of staff privileges and monetary damages. The complaint alleges three separate theories of recovery against defendant. First, plaintiff alleges that the defendant violated federal antitrust laws in particular Section 1 and Section 2 of the Sherman Act, 15 U.S.C. § 1 and § 2. Second, plaintiff alleges that her discharge violated plaintiff's federal constitutional rights under the First and Fourteenth Amendments. Finally, plaintiff asserts that defendant's actions were arbitrary, capricious and unfair. The court will decide each theory separately.

Plaintiff first contends that the provisions of the Sherman Act were violated by a proposed contract and Dr. Ahmad's exclusive services contract with the hospital.

It is plaintiff's position that the proposed contract for staff privileges as an independent contractor was illegal because it contained the following clause:

Continuance as an anesthesiologist in practice at the hospital beyond the terms of this agreement will be based upon a satisfactory evaluation by the medical director. The physician will be notified in writing by the medical director of this decision thirty (30) days prior to the end of the agreement. If this agreement is not continued, the physician's medical staff membership and privileges will be automatically terminated without recourse to the fair hearing plan in any of the due process provisions of the medical staff by-laws and rules and regulations.

Plaintiff's antitrust claims with respect to the proposed contract and exclusive services contract are without merit for the following reasons. First, plaintiff's claims run afoul to a fundamental tenet of antitrust law. Antitrust laws are designed to protect and foster competition in the market. The laws are not for the individual economic benefit of competitors. Second, the contract OLM offered to, but not accepted by plaintiff raises no antitrust issues. Third, the exclusive services contract between Dr. Ahmad and OLM does not violate Section 1 and Section 2 of the Sherman Act. This conclusion is clear after the United States Supreme Court's recent and controlling decision in *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). Finally, the recent Seventh Circuit Court of Appeals' decision in *Marrese v. Interequal, Inc.*, 748 F.2d 373 (7th Cir. 1984), precludes plaintiff from challenging OLM's decision under the federal antitrust laws because of the exemption doctrine of state action.

In her complaint plaintiff alleges OLM violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 and § 2. These sections address business competition and are designed to prevent restraints which have a significant effect on such competition. On its face Section 1 proscribes every contract

or combination in restraint of trade that affects interstate commerce. Courts interpret the language of Section I as prohibiting only those combinations which unreasonably restrain competition. *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). In other words those combinations having a significant effect on competition. Courts, in deciding whether a particular contract or combination unreasonably restrains competition, use either a *per se* test or the rule of reason test. The applicability of the two tests to the contract or combination in question depends generally on the nature of the contract or combination and the surrounding circumstances in the relevant economic market. The relevant economic market is usually defined in both product and geographical terms.

■ The main contract at issue here, Dr. Ahmad's exclusive dealing contract with the hospital establishes an independent contractor relationship between OLM and Dr. Ahmad and is commonly referred to as a tying agreement or arrangement. A tying agreement occurs where the seller of a product or service (the tying product or service) agrees to sell this product or service on the condition that the buyer also purchase the other product or service (the tied product or service). *Northern Pacific Railway Company v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

The defendant's tying service is the performance of surgery and the tied service is the performance of anesthesiology by Dr. Ahmad or one of the doctors working with or for Dr. Ahmad. In other words, a patient, the consumer or buyer wishing to purchase the service of surgery at OLM, must also purchase the tied service of anesthesiology at OLM's hospital through the services of Dr. Ahmad.

■ The same exclusive anesthesiology contract and resulting situation was at issue in *Jefferson Parish Hospital*. The Supreme Court rejected plaintiff's claim that the contract was in violation of the antitrust laws because it denied plaintiff the right to practice anesthesiology at the hospital. The Court held that the exclusive service contract was not a violation of the antitrust laws in the absence of a showing that the hospital decision to enter into this contract had any adverse effect on the competition among anesthesiologists or forced patients to accept the services of an anesthesiologist—that the patient would otherwise find unacceptable. Near the end of Justice Stevens' opinion in *Jefferson Parish Hospital* he summarized the facts before the Court.

> In sum, all that the record establishes is that the choice of anesthesiologists at East Jefferson has been limited to one of the four doctors who are associated with Roux and therefore have staff privileges. Even if Roux did not have an exclusive contract, the range of alternatives open to the patient would be severely limited by the nature of the transaction and the hospital's unquestioned right to exercise some control over the identity of the number of doctors to whom it accords staff privileges. If respondent is admitted to the staff of East Jefferson, the range of choice will be enlarged from four to five doctors, but the most significant restraints on the patient's freedom to select a specific anesthesiologist will nevertheless remain. Without a showing of actual adverse effect on competition, respondent cannot make out a case under the antitrust laws, and no such showing has been made. (Footnotes omitted.)

*Jefferson Parish Hospital*, 104 S.Ct. at 1568.

As made clear by the *Jefferson Parish Hospital* decision, the relevant market analysis focuses on the services offered by the hospital to the potential patients and the effect such a contract would have on competition among anesthesiologists practicing in the relevant geographic area. It is a mistake to focus on the effect of the contract on the individual doctor denied practice privileges. This distinction is made clear by a footnote in *Jefferson Parish Hospital*.

An examination of the reason or reasons why petitioners denied respondent staff privileges will not provide the answer to the question whether the package of services they offered to their patients is an illegal tying arrangement. As a matter of antitrust law, petitioners may give their anesthesiology business to Roux because he is the best doctor available, because he is willing to work long hours, or because he is the son-in-law of the hospital administration without violating the per se rule against tying. *Without evidence that petitioners are using market power to force Roux upon patients there is no basis to view the arrangement as unreasonably restraining competition whatever the reasons for its creation. Conversely, with such evidence, the per se rule against tying may apply. Thus, we reject the view of the District Court that the legality of an arrangement of this kind turns on whether it was adopted for the purpose of improving patient care.* (Emphasis added).

*Id.* at 1565 n. 41.

■ After *Jefferson Parish Hospital* the critical question is whether the exclusive service contract causes patients to use an unwanted anesthesiologist in order to obtain needed hospital surgery service at OLM.

■ The Supreme Court in the *Jefferson Parish Hospital* case held that the exclusive services contract was not *per se* illegal because the hospital did not have sufficient market power in the field of hospital surgery to force patients to use their staff anesthesiologists' services. The relevant evidence established that the hospital only had a 30 percent share of the market for surgery. In other words, 70 percent of the people seeking surgery went to other nearby competing hospitals.

In this case OLM's depositions and affidavits establish that it does not possess market share anywhere near the 30 percent found insufficient in the *Jefferson Parish Hospital* decision. Therefore, the contract between Dr. Ahmad and the hospital is not illegal *per se.* OLM's market share for surgery patients among hospitals in or around Northwest Indiana is approximately nine percent. (Reflected in OLM's exhibits.) The deposition and affidavit of plaintiff's expert does not create a material issue of fact on the critical questions of market share or force. Plaintiff's expert mistakenly focused on the individual effect the contract had on plaintiff not on the patients in the market place or other competing anesthesiologists.

■ The next question under the analysis framework set out in *Jefferson Parish Hospital* case is whether the exclusive service contract unreasonably restrains competition among anesthesiologists. The Supreme Court decided that there was insufficient evidence to show that the contract unreasonably restrained competition. The Court stated:

There is, however, insufficient evidence in this record to provide a basis for finding that the Roux contract, as it actually operates in the market, has unreasonably restrained competition. The record sheds little light on how this arrangement affected consumer demand for separate arrangements with a specific anesthesiologist. The evidence indicates that some surgeons and patients preferred respondent's services to those of Roux, but there is no evidence that any patient who was sophisticated enough to know the difference between two anesthesiologists was not also able to go to a hospital that would provide him with the anesthesiologist of his choice. (Footnotes omitted.)

*Id.* at 1567–68.

Likewise, in this case plaintiff offers no facts showing that a surgery patient was not able to go to a different hospital in order to obtain the services of an anesthesiologist other than Dr. Ahmad or her associates.

The facts that OLM's decision caused plaintiff loss of income and apparent inability to practice anesthesiology at other area hospitals simply do not support a cause of

action under the antitrust laws. There is no competent evidence showing that Dr. Ahmad's contract had an unreasonable restraint of competition among anesthesiologists in the relevant market. The only person who suffered because of defendants' actions was plaintiff personally. There is nothing in the record that shows an economic injury suffered by hospital patients or other anesthesiologists as the result of defendants' actions.

■ Another barrier to plaintiff's antitrust claims is the Seventh Circuit's recent decision in *Marrese v. Interequal, Inc.*, 748 F.2d 373 (7th Cir.1984), and the legal principles set out therein. The plaintiff in *Marrese* was an orthopedic surgeon who lost his staff privileges for improper surgical procedure. One of defendants was Deaconess Hospital in Evansville, Indiana. Plaintiff sued the hospital, board of directors and individual committee members of the hospital. One of plaintiff's theories of recovery was an antitrust violation under the Sherman Act. The Seventh Circuit Court of Appeals held that plaintiff had no cause of action under the Sherman Act because the conduct complained fell within the exemption doctrine of state action. This doctrine exempts state conduct from antitrust regulations. The test used by the Court in *Marrese* to determine whether defendant's conduct was exempt under the doctrine of state action consists of two parts:

(1) whether the defendant's conduct is clearly articulated and affirmably expressed as (Indiana) state policy,

(2) whether the state policy is actively supervised by the State itself.

The Court, in *Marrese*, found that both parts of the test were met. The following excerpts from Judge Coffey's opinion are instructive:

> Common sense dictates that a cause of action under the Sherman Act is not created every time ... a physician, surgeon, or specialist has hospital staff privileges denied or revoked.
>
> . . . .
>
> *Dr. Marrese has no cause of action under the Sherman Act against the defendants as participants in the state mandated and supervised medical peer review process.* Instead, Dr. Marrese must challenge the defendants' conduct and motives through the proper *forums; the hospital hearing committees and the Indiana state court system.* (Emphasis added.)

*Id.* at 393. The quote is generally applicable to the antitrust portions of plaintiff's complaint.

Next plaintiff asserts that OLM's conduct violated 42 U.S.C. § 1983 and plaintiff's rights of freedom of speech and due process of law guaranteed under the First and Fourteenth Amendments of the United States Constitution. Plaintiff contends that because of the Indiana hospital licensing and regulatory statutes, I.C. 16–10–1–1 and (or through) 16–10–1–9, OLM is a public institution in the sense that its actions are governed by and subject to the provisions of the Fourteenth Amendment and 42 U.S.C. § 1983.

■ The Fourteenth Amendment to the United States Constitution applies to acts of the states, not to acts of private persons or entities.[2] Congress enacted 42 U.S.C. § 1983[3] to enforce the Fourteenth Amendment. Section 1983 protects a citizen's Fourteenth Amendment rights from depri-

---

**2.** The Fourteenth Amendment states in pertinent part:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**3.** 42 U.S.C. § 1983 states:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

vation by persons acting under color of state law.

■ The necessary state action inquiry for suits brought under § 1983 is that the plaintiff must demonstrate a sufficiently close nexus between the State and *the challenged action of the regulated entity* so that the action of the latter may be fairly treated as that of the State itself. *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1975) (emphasis added); *Anderson v. National R.R. Passenger Corp. (AM-TRAK),* 754 F.2d 202 (7th Cir.1985).

The United States Supreme Court in a trilogy of cases recently discussed the parameters of protection provided by 42 U.S.C. § 1983 for alleged Fourteenth Amendment violations. *Lugar v. Edmonson Oil Company Inc.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982).

In *Rendell-Baker* the Court stated:

The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights fairly attributable to the state.

. . . .

If the action of the respondent is not state action, our inquiry ends.

*Rendell-Baker,* 102 S.Ct. at 2770.

In *Lugar* the Court in a 5–4 decision held that a private citizen's use of state's prejudgment attachment and levy statute where the state court clerk issued the writ and the writ was executed by the county sheriff constituted state action for purposes of the Fourteenth Amendment and satisfies § 1983 requirement of action under color of state law.

In *Rendell-Baker* the Court held that a private special education school's decision to fire teachers was not state action despite

detailed state regulation and substantial state funding.

Finally, in *Blum* the Court held that a privately owned and operated nursing home's medical decision to discharge or transfer Medicaid patients is not state action. In *Blum* the Court stated:

Those decisions ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State.

*Blum v. Yaretsky,* 102 S.Ct. at 2788. Later on in the opinion the *Blum* Court notes that none of the regulations calls for the state officials to review the propriety of the decision to transfer or discharge. *Id.* at 2790.

Justice White in his concurring opinion in *Blum* pointed out that state action was absent because the transfer or discharge decision is a private medical judgment according to professional standards that are not established by the State. *Id.* at 2789.

■ This case is more akin to the decisions in *Rendell-Baker* and *Blum* than the decision in *Lugar.* Although plaintiff here was not the employee of defendant hospital, the termination decision was similar to the private employment termination decision in *Rendell-Baker* and based on professional medical judgment as in *Blum.* The critical facts of joint and necessary involvement of state officials in the very activities complained of found in *Lugar* is missing in this case. In other words, plaintiff cannot make the required showing that the State of Indiana is responsible in any way for her termination from the staff at OLM.

This court's conclusion of a lack of state action is supported by the federal Court of Appeals decisions of *Crowder v. Conlan,* 740 F.2d 447 (6th Cir.1984); *Mendez v. Belton,* 739 F.2d 15 (1st Cir.1984); *Hicks v. Southern Md. Health Systems Agency,* 737 F.2d 399 (4th Cir.1984).

In *Crowder* the plaintiff was a medical doctor who filed a civil rights suit under 42 U.S.C. § 1983 complaining about the defendant hospital's decision to restrict plaintiff's staff privileges at the hospital. The

hospital's decision was made after fellow doctors' complaints followed by an internal investigation and review process similar to the one employed in this case. The Court of Appeals affirmed the district court decision granting summary judgment holding that defendant's decision did not constitute state action. *Crowder*, 740 F.2d at 453.

In *Mendez* the Court held that the plaintiff failed to prove that the hospital's decision revoking plaintiff's doctor staff privileges was made under color of state law. *Mendez*, 739 F.2d at 18.

Finally, in *Hicks* the plaintiffs were discharged employees. The defendant was a health system agency provided for under the National Health Planning and Resource Development Act, 42 U.S.C. § 3001. The plaintiffs argued that the discharge violated their due process rights under the Fifth and Fourteenth Amendments. The Court held that plaintiffs could not avail themselves to these Amendments because the defendant's personnel decisions did not constitute state or federal action. *Hicks*, 737 F.2d at 403.

The *Hicks* Court stated:

There is far less regulation of the SMHSA by the federal government than there is by the state government. The SMHSA is not an official agency of the federal government, and federal regulation is restricted primarily to oversight and funding supervision. The federal government does not regulate the SMHSA's internal employment procedures, it does not control policy directives, and, in fact, it has minimal influence over the day-to-day functioning of the SMHSA.

*Id.* at 403.

The State of Indiana's regulatory scheme (I.C. 16–10–1–1 through 16–10–1–9) for privately owned and operated hospitals does not include state standards for judging the particular individual medical competency of persons in plaintiff's position: that is an independent contractor enjoying probationary staff privileges at the hospital. The statutory requirement of a peer medical review panel by itself does not lead to the opposite conclusion. This requirement does not place the State of Indiana into the position of participating, regulating or even reviewing a hospital's staff privilege decisions.

An argument or suggestion to that effect erroneously extends the intent and reach of the individual peer review statute and the Indiana Regulatory Act for Hospitals. Cases are legion that the existence of state regulation over the defendant is insufficient in itself to establish state action. The existence of the peer review system by itself cannot be said to make defendant's decision, without any showing of state participation or input, the decision of the state itself. The connection is simply far too removed and tenuous.

The court's conclusion as to the effect or reach of Indiana's regulatory scheme for private hospitals is supported by the recent Indiana Court of Appeals' decision of *Kiracofe v. Reid Memorial Hospital,* 461 N.E.2d 1134 (Ind.App.1984).

In *Kiracofe,* the Indiana Court of Appeals held that the hospital's decision to terminate plaintiff's staff privileges was not state action for purposes of the Fourteenth Amendment because there was no evidence that the State was a participant in the decision or sought to influence the hospital's decision through direct regulation. *Id.* at 1139. The Court's conclusion of no state action in defendant's decision to terminate plaintiff's staff privileges ends the § 1983 inquiry, (*Rendell-Baker,* 102 S.Ct. at 2770) and likewise bars plaintiff's federal procedural due process argument. Private conduct, no matter how wrongful or arbitrary raises no Fourteenth Amendment concern. *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 349, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974).

Finally, in the *Anderson* case cited above the Court held that Amtrak was not required to provide Fifth Amendment due process protection when it fired plaintiff for stealing because there was no federal government action involved in the termination decision. The Seventh Circuit's deci-

sion relied on the absence of any allegations that the government was responsible for the alleged inadequate investigation of the charge of stealing or that the government was involved with Amtrak's personnel policies or decisions. *Anderson,* 754 F.2d at 204.

■ Before leaving plaintiff's antitrust and § 1983 claims the court addresses the argument made by plaintiff at oral argument that it is legally inconsistent for defendant to rely on the doctrine of state action in regard to plaintiff's antitrust claims while at the same time argue no state action with respect to plaintiff's § 1983 claims. At first blush defendant's position does seem inconsistent. However, a close reading of the law shows otherwise. These two legal concepts have different legal elements. In *Marrese,* the Court of Appeals wrote:

> We are cognizant of the district court's ruling that the plaintiffs did not allege sufficient 'state action' to state a cause of action under 42 U.S.C. § 1983. The plaintiffs did not appeal the district court's dismissal of their claim under 42 U.S.C. § 1983 nor was this court presented with any argument on the issue. We note that the elements required for a cause of action under 42 U.S.C. § 1983, a 'deprivation ... caused by the exercise of some right or privilege created by the State' and 'the party charged with the deprivation must be a person who may fairly be said to be a state actor,' *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982) differ from the elements required for state action under *Parker.* We further note that the Fair Hearing Plan at Deaconess Hospital provides Dr. Marrese with the due process safeguard of an evidentiary hearing and, if necessary, a review hearing before the joint conference committee of the hospital. Moreover, if Dr. Maresse's clinical privileges at Deaconess are, in fact, revoked, the hospital's decision can be appealed through the Indiana state court system.

*Marrese,* 748 F.2d at 395, n. 25.

Eliminating from consideration plaintiff's allegations based on federal law the court must now address what review process, if any, plaintiff was entitled to receive from defendant, given plaintiff's position as a nonemployee physician with probationary staff privileges. Plaintiff generally contends that the procedures used by defendant in firing plaintiff violated the hospital bylaws and moreover were arbitrary, capricious and unfair. Any procedures or process due plaintiff in this case must necessarily arise from state law or the hospital's bylaws. These state law issues are before the court because of diversity jurisdiction.

The leading case in Indiana on this issue is *Yarnell v. Sisters of St. Frances Health Services,* 446 N.E.2d 359 (Ind.App.1983), *cited* in *Kiracofe.*

Judicial review of these hospital decisions is very limited. The reasons for this limited review is self-evident by the nature of the decision. Generally fellow medical doctors and hospital administrators are much more competent to judge the qualifications of a physician initially seeking or retaining hospital staff privileges. Courts should be very hesitant to second-guess these medical decisions. *Terre Haute Regional Hospital v. EL–ISSA,* 470 N.E.2d 1371, 1382 (J. Neal concurring opinion).

In *Yarnell* the Court stated:

> Generally, a hospital can exclude a licensed physician from its staff without being subject to a judicial review. When a hospital is determining whether to reappoint a physician to its medical staff, the decision is subject to the limited judicial review of whether the hospital administration adhered to the procedures contained in the bylaws. Where the hospital follows the procedures in its bylaws, any decision reached by the hospital board shall not be subject to judicial review.

*Yarnell,* 466 N.E.2d at 361, (and citing cases from other states including the Illinois case of *Spencer v. Community Hospital of Evanston,* 87 Ill.App.3d 214, 42 Ill. Dec. 272, 408 N.E.2d 981 (1980).)

In paragraph 16 of the verified complaint plaintiff alleges:

The plaintiff was, thereupon, subjected to an administrative procedure which was arbitrary, unreasonable, capricious, illegal and in violation of her rights under the Constitution and laws of the United States. In particular, plaintiff's rights were violated as follows:

After this paragraph the complaint contains subsections a)–i) which contain specific complaints about the procedures used by the hospital leading up to plaintiff's denial of staff privileges. The complaints include the following:

Plaintiff was provided inadequate statement of the charges; the reviewing committee (whose members did not practice anesthesiology) were medically incompetent to judge plaintiff's performance; plaintiff was not given a hearing before defendant's Divisional Board.

Under the legal standard set out in *Yarnell* the court must decide whether the uncontested material facts establish that the procedures used by the hospital were in accordance with its bylaws. If the hospital followed its bylaws when denying the plaintiff staff privileges then their actions are not subject to further judicial review under Indiana law.

■ After reviewing the pertinent affidavits, depositions and exhibits offered into evidence by the parties the court finds that the procedures used by the defendant in denying plaintiff staff privileges were in accordance with their bylaws. In her deposition plaintiff testified that she believed that the bylaws were followed. The defendant's medical staff bylaws clearly indicate that probation staff members are not afforded the same procedural protections and review rights concerning adverse actions such as termination of privileges.

Bylaw 3.3 entitled Basic Responsibilities of Medical Staff Membership requires that doctors provide care at the general recognized professional level of quality and efficiency. Moreover, doctors on defendant's staff must abide by the hospital's rules and regulations. Section 4.4–3 makes these general requirements of professional conduct applicable to probationary staff members. Moreover, under this section a probationary staff member whose medical practice is below standard or violates rules and regulations can be terminated.

Pursuant to Section 4.4–4(a), Dr. Ahmad was responsible for monitoring the performance of plaintiff, including the preparation of a written evaluation report covering the prior six month period. This report is then passed on to the Credentials Committee and the Medical Executive Committee. Section 4.4–4(b). Dr. Ahmad prepared two reports which were very critical of plaintiff's performance. The first report recommendation was that plaintiff's probationary period be extended so that Dr. Ahmad could make a further evaluation of plaintiff's qualifications. In the second report Dr. Ahmad found that plaintiff's performance was still inadequate and recommended to the Credentials and Medical Executive Committees that plaintiff's probationary staff privileges be terminated.

Article VI of the bylaws sets out the procedures for appointments and reappointments to the medical staff. This Article makes a clear distinction between the procedures to be used for probationary members in contrast to active and associate staff members.

Section 6.7–1 deals with the reappointment and corrective action for probationary staff members. It states:

At the end of each six month period (except as otherwise provided in Section 4.4–4(c), a member of the probationary staff shall be automatically reappointed to the probationary staff for an additional six months with the same clinical privileges unless, in the report to be prepared pursuant to Section 4.4–4(b), the chairperson of the department or his or her designee recommends that the probationary staff member not be reappointed or that his or her privileges be reduced. Anything in these bylaws to the contrary notwithstanding, in the event it is recommended that the probationary staff member not be reappointed or that his or her privileges be reduced or in the event corrective action is recommended against

a member of the probationary staff, the recommendation shall be processed in the same manner as an application for initial appointment to the medical staff, following the procedure described in Sections 6.4–4 through 6.4–10, and the probationary staff member shall be entitled to request the interview described in those sections and shall have the opportunity to file a written statement with the board following the interview, in lieu of the hearing and appeal described in the fair hearing plan.

This section specifically denies plaintiff the right to a formal hearing and appeal process set out in the Fair Hearing Plan found immediately following the bylaws. Instead plaintiff was entitled to file a written statement contesting the adverse recommendation and request an interview. According to Sections 6.4–4 and 6.4–5 Dr. Ahmad's written recommendation had to be reviewed by the Chairman of Surgery and the Credentials Committee and then the Medical Executive Committee. The record indicates that this review procedure was followed in this case.

Plaintiff's complaint that she was not afforded a formal hearing with the right of counsel is without merit. Her right to an interview does not encompass these rights. Section 6.4–6 provides in pertinent part:

The interview shall be informal in nature, shall not include the right to be represented by counsel or to call witnesses and shall not be conducted according to the procedural rules provided in the fair hearing plan. The applicant shall be informed of the general nature of the circumstances surrounding the recommendation of the medical executive committee and may present information relevant thereto. Minutes or a similar record of such interview shall be made.

Moreover, the provisions of Article IX buttress the conclusion that plaintiff was not entitled to a formal hearing and appeal process. Section 9.2 specifically denies probationary staff members the right to appellate review by a panel composed of members of the Board of Directors.

Additionally, plaintiff's complaint that the hospital's decision was unfair because nonmedical personnel had input into the decision is without merit. Section 12–5 of the Bylaws specifically allows nonmedical personnel representation on a medical staff committee. Similarly, plaintiff's other argument that it was unfair for these nonmedical personnel and doctors whose specialty is not anesthesiology to review plaintiff's qualifications is without merit. It is not unreasonable to allow physicians from allied fields such as surgery to assist in making an evaluation of whether an anesthesiologist is qualified and has the necessary training, skills or motivation. Plaintiff did not have a right under the bylaws for legal representation throughout the hospital review process that led to the termination of her medical privileges. Finally, various physicians and administrators reviewed the charges against plaintiff and agreed that the charges warranted termination. Before recommending termination of staff privileges, Dr. Ahmad, the department head, allowed plaintiff a second chance to improve her performance.

The next issue before the court is whether plaintiff is entitled to a preliminary injunction. The injunction primarily seeks reinstatement. The issue has been decided *sub silentio* by the court's determination that defendant's motion for summary judgment is well taken. The granting of the summary judgment necessarily precludes plaintiff from showing a likelihood of success on the merits of her complaint. *Technical Publishing Co. v. Lebhar-Friedman Inc.,* 729 F.2d 1136, 1138–1139 (7th Cir. 1984); *Dos Santos v. Columbus-Cuneo-Cabrini Medical Center,* 684 F.2d 1346 (7th Cir.1982).

In *Dos Santos* the court held that an anesthesiologist denied the opportunity to practice anesthesiology under similar circumstances to the case at bar was not entitled to a preliminary injunction. In so holding the Court found that plaintiff had failed to satisfy three of four prerequisites necessary to the issuance of a preliminary injunction. (The threat of irreparable inju-

ry for which there is no adequate remedy at law; the balance of hardships favors the issuance of the injunction and the issuance of the preliminary injunction favors the public interest.) The Court of Appeals *in dicta* questioned the validity of plaintiff's antitrust claim based on the exclusive services contract. *Id.* at 1352–1356.

This court's decision is in accord with the Seventh Circuit Court of Appeals' opinion in *Dos Santos.*

The final issue is whether defendant's motion for summary judgment should be denied under Rule 56(f) which provides:

> Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

The justification for such a motion must be genuine and convincing to the court rather than merely colorable. *Pfeil v. Rodgers,* 757 F.2d 850, 856 (7th Cir.1985), *quoting Robin Construction Co. v. United States,* 345 F.2d 610, 614 (3rd Cir.1965). When a party fails to secure discoverable evidence due to his own lack of due diligence, it is not an abuse of discretion for the trial court to refuse to grant a continuance to obtain such information. *Id.* at 857, *citing Reeg v. Shaughnessy,* 570 F.2d 309, 316 (10th Cir.1978).

Plaintiff's request under Rule 56(f) does not preclude the court from granting defendant's motion for summary judgment. Plaintiff has not met the burden of showing that matters she sought would change the result of the case. The fact that some of the missing material may be helpful as relates to the case is not enough. The requested materials would not enable plaintiff to resist defendant's motion for summary judgment. *Gieringer v. Silverman,* 731 F.2d 1272 (7th Cir.1984). Moreover, notwithstanding defendant's refusal to turn over various information plaintiff has had adequate time to develop his case in opposition to defendant's motion through other available discovery procedures.

IT IS THEREFORE ORDERED that plaintiff's verified motion for continuance of hearing on motion for summary judgment is OVERRULED and DENIED.

IT IS FURTHER ORDERED THAT plaintiff's motion for preliminary injunction is OVERRULED and DENIED.

IT IS FURTHER ORDERED that defendant's motion for summary judgment is GRANTED and judgment is hereby ordered entered in favor of the defendant, Sisters of Mercy Health Corporation, and against the plaintiff, Elena Ezpeleta, M.D. Each side shall bear their own costs.