966 F.2d 1456
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
R. Anthony MARRESE, M.D., Plaintiff-Appellant,
v.
DEACONESS HOSPITAL, an Indiana not-for-profit corporation,
William H. Allen, M.D., and Bryant A. Bloss, M.D.,
et al., Defendants-Appellees.
 No. 90-3415.
 United States Court of Appeals, Seventh Circuit.
 Argued Nov. 4, 1991.
Decided June 1, 1992.
Rehearing Denied July 22, 1992.
 
 1
 Before MANION and KANNE, Circuit Judges, and HUBERT L. WILL, Senior District Judge*.
 
 ORDER
 
 2
 At the conclusion of a peer review process, R. Anthony Marrese, M.D., an orthopedic surgeon specializing in spine disorders, lost his staff membership and clinical privileges at Deaconess Hospital in Evansville, Indiana ("Deaconess"). Marrese brought this diversity suit in federal district court against Deaconess and the physicians and attorneys involved in the peer review process. Marrese's complaint alleged tortious interference with business relations and violations of the Indiana antitrust statute, Ind.Code § 24-1-2-1. After finding that the immunity provision of the Indiana Peer Review Statute, Ind.Code § 34-4-12.6-3, shielded the defendants from liability, the district court granted the defendants' motions for summary judgment and denied Marrese's motion for summary judgment. On appeal, Marrese raises two claims: (1) that a question of fact remains as to whether the defendants acted in "good faith" as required by the immunity statute, and (2) that the immunity provided in the statute does not shield the defendants from state antitrust liability. We affirm the district court's judgment.
 
 I. Background
 
 3
 In 1983, following an investigation (that began in 1978), the Board of Directors at Deaconess revoked Marrese's staff membership and clinical privileges at Deaconess. Marrese claims that the defendants, who each in some way participated in the process that led to the Board of Directors' action, have tortiously interfered with his business relations and violated Indiana antitrust laws. The limited immunity provided by the Indiana Peer Review Act, however, stands between Marrese and the defendants. Before reviewing the events leading to the revocation of Marrese's privileges, we should first briefly explore the process known as "peer review" and set out the pertinent provisions of the Indiana Peer Review Act that Marrese must overcome.
 
 A. Peer Review in Indiana
 
 4
 The Indiana legislature has placed "supreme authority" in hospital governing boards. The statute makes each board responsible for the management and control of its hospital facility as well as for the appointment, reappointment, and the assignment of privileges of the members of the medical staff. Ind.Code § 16-10-1-6.5(a)(2). Furthermore, the legislature has vested the medical staff of a hospital with "the responsibility of reviewing the professional practices in the hospital for the purposes of reducing morbidity and mortality, and for the improvement of the care of patients in the hospital." Ind.Code § 16-10-1-6.5(c). Medical staffs carry out their responsibility through a process known as "peer review" in which they evaluate the qualifications, competence, professional conduct and patient care of physicians on staff. Ind.Code § 34-4-12.6-3 et seq. To encourage physicians to candidly evaluate one another in fulfillment of their statutorily imposed responsibility, the Indiana legislature has provided limited immunity to those involved in the peer review process. Ind.Code § 16-10-1-6.5(d) and §§ 34-4-12.6-1 et seq. The limits on that immunity play a central role in this controversy.
 
 
 5
 The civil procedure statutes provide as follows:
 
 
 6
 The members of any medical staff committee organized for the purpose of conducting medical review ... shall have absolute immunity from civil liability for communications made in committee meetings, and reports and recommendations made by the committee arising from deliberations by the committee to the governing board of the hospital or another duly authorized medical staff committee.
 
 
 7
 Ind.Code 16-10-1-6.5(d). Similarly, under the Indiana Peer Review Act, the "personnel of a peer review committee[1] [are] immune from any civil action arising from any determination made in good faith in regard to evaluation of patient care...." Ind.Code 34-4-12.6-3(c). In addition, the Act immunizes
 
 
 8
 a peer review committee, an organization, or any other person who, in good faith ... furnishes records, information, or assistance to a peer review committee that is engaged in: (1) the evaluation of the qualifications, competence, or professional conduct of a professional health care provider; or (2) the evaluation of patient care ... unless the person knowingly furnishes false records or information.
 
 
 9
 Ind.Code 34-4-12.6-3(b).
 
 
 10
 The Act states that "evaluation of patient care" relates to the following:
 
 
 11
 (1) the accuracy of diagnosis;
 
 
 12
 (2) the propriety, appropriateness, quality or necessity of care rendered by a professional health care provider; and
 
 
 13
 (3) the reasonableness of the utilization of services, procedures, and facilities in the treatment of individual patients.
 
 
 14
 As used in this chapter, the term does not relate to charges for services or to methods used in arriving at diagnoses.
 
 
 15
 Ind.Code 34-4-12.6-1(b).
 
 
 16
 The Act defines "in good faith" as follows:
 
 
 17
 "[I]n good faith" refers to an act taken without malice after a reasonable effort to obtain the facts of the matter and in the reasonable belief that the action taken is warranted by the facts known. In all actions to which this chapter applies, good faith shall be presumed, and malice shall be required to be proven by the person aggrieved.
 
 
 18
 Ind.Code 34-4-12.6-1(f).
 
 
 19
 To circumvent the immunity shielding the defendants, Marrese does not challenge the peer review process itself but instead challenges the motives of the defendants who participated in the peer review process. Marrese's account of events between 1978 and 1983 does not diverge from the defendants' account in any material way. However, Marrese peppers his Statement of Facts with allegations without supporting these "facts" with any citation to the record in complete violation of Circuit Rule 28(d)(2). To show that a dispute as to material facts exists and thereby overcome a motion for summary judgment, Marrese must offer more than his allegations. Without these references to documents and depositions in the record that support his version of the facts, verification of Marrese's "facts" was extremely time consuming for this court, and Marrese cannot complain if the court disregards some of his "facts" because it fails to locate the supporting documentation in the voluminous record in this appeal.
 
 B. Marrese's Peer Review
 
 20
 On February 8, 1978, at the suggestion of defendant William H. Allen, M.D., the Medical Staff Executive Council ("MSEC") of Deaconess decided to request an audit of "back surgeries" by the Department of Surgery. The Department of Surgery formed an audit subcommittee consisting of defendants Allen, Thomas Evans, M.D., Ahmet K. Percinel, M.D., and Ronald Rabin, M.D. The audit subcommittee agreed to conduct an audit of both lumbar laminectomies and lumbar spinal fusions performed between June 1, 1977 and May 31, 1978.
 
 
 21
 The two audits were conducted as screening audits to determine if any anomalies or problems existed with the two types of surgery under study. The spinal fusion audit disclosed frequent but questionable justification for spinal fusions based on extensive laminectomies.[2] After further examination, the audit subcommittee reported no particular problems with Marrese's laminectomies but did report that there was inadequate objective evidence to justify many of the 32 spinal fusions Marrese performed.
 
 
 22
 On January 9, 1980, the MSEC decided that the audit subcommittee should meet with Marrese to go over cases in which the subcommittee found problems and discuss those problems with Marrese. Marrese met with the audit subcommittee on January 23, 1980. The 50 page transcript of the meeting reveals that the audit subcommittee succeeded in discussing only one case with Marrese.
 
 
 23
 On August 13, 1980, Allen reported to the MSEC that the audit subcommittee had again reviewed eight of Marrese's charts which raised concerns about Marrese. The MSEC took no action against Marrese. Subsequently, however, the audit subcommittee provided for further review the same eight charts (without x-rays) to George F. Rapp, M.D., an orthopedic surgeon in Indianapolis.
 
 
 24
 Rapp reported to John C. Render, an attorney for Deaconess, in a letter dated February 2, 1981. Rapp concluded that "it would be difficult ... to truly evaluate these patients or their surgical results by reviewing their charts alone." However, Rapp stated that from his review, it appeared that Marrese extended the indications for spinal fusion "considerably" and questioned the long term benefit to the patients. Rapp suggested that Deaconess consult an outside national firm that could compare Marrese's overall work with the general standards of the orthopedists of the United States and with those in Evansville. Rapp also suggested that at least two experts be assigned to conduct the evaluation, one selected by Marrese and one selected by Deaconess.
 
 
 25
 Deaconess retained InterQual, Inc.[3] to make a special audit of Marrese's surgical procedures, and InterQual reported problems with Marrese's surgeries to Deaconess in February 1982. Based in part on the results of the InterQual report, the audit subcommittee recommended to the MSEC that Marrese be summarily suspended pursuant to the Medical Staff Bylaws. On March 11, 1982, however, the MSEC decided that Marrese would be given a copy of the InterQual report, that Marrese would be invited to a special MSEC meeting, and that no action would be taken until the meeting was held.
 
 
 26
 Marrese attended the two special MSEC meetings with his attorneys, testified, presented expert testimony, objected to formation of the audit subcommittee, and questioned InterQual's qualifications. Following these meetings, the Chairman of the MSEC notified Marrese that the MSEC had voted to revoke his staff membership and clinical privileges but stayed the effect of the revocation until Marrese had exhausted his rights under the Fair Hearing Plan provided under the Medical Staff Bylaws.
 
 
 27
 Subsequently the MSEC attempted to negotiate with Marrese to settle the matter and avoid official revocation of privileges, but these settlement efforts failed. The president of the medical staff then named the following physicians to the hearing panel: T.J. Rusche, M.D., R. Sowa, M.D., J.A. Rang, M.D., R. Wagner, M.D., and R.F. Carlson, M.D. All of these physicians are defendants in this action. The MSEC then postponed the Fair Hearing procedures pending the disposition of an antitrust suit that Marrese filed in federal court against Deaconess, members of the medical staff and others. Upon dismissal of the action, the MSEC voted to proceed with the Fair Hearing.
 
 
 28
 The MSEC decided to amend the charges against Marrese before proceeding with the Fair Hearing. The MSEC had received several reports of Marrese's belligerent and disruptive conduct since the MSEC had voted to revoke his privileges. Furthermore, Deaconess had been forced to sue Marrese to obtain the return of patient x-rays.[4] The MSEC notified Marrese of these new charges of disruptive conduct on May 18, 1983[5] and specified 20 patient charts that illustrated his medical care was below acceptable standards.
 
 
 29
 The MSEC gave Marrese the option to retain the previously selected panel or replace it with four physicians who were not on staff at Deaconess. Marrese chose to have a panel of physicians from Deaconess as provided in the Fair Hearing Plan but requested the opportunity to select half the members of that panel. The MSEC responded that it would not substitute the members of the panel unless Marrese could show "actual inability" of panel members to remain impartial.[6] The hearing was scheduled for July 9, 1983.[7]
 
 
 30
 At the hearing, Baker resigned at Marrese's request. His resignation left only four members on the panel. After questioning the panel members and eliciting their personal and professional opinions of Marrese, Marrese's counsel stated that he had no objection to the reduced number of panel members or to the panel's make-up. Marrese's counsel elaborated by saying "Mr. Powell, we have no objections to the members of the Hearing Panel, we think they are taking their position here quite seriously and it seems to us that they are going to make an effort to give an objective hearing today." (Defendants' Motion for Summary Judgment, Affidavit of David A. Johnson, Exhibit 1, Fair Hearing Tr. at 15).
 
 
 31
 Frederick W. LaCava, a defendant in this case, represented the audit subcommittee at the hearing and presented evidence on its behalf. The evidence included both testimonial and documentary evidence. Because the members of the audit subcommittee agreed that the InterQual report contained inaccuracies, the audit subcommittee did not introduce it into evidence at the hearing.
 
 
 32
 Marrese's counsel cross-examined the witnesses against Marrese, called Marrese and four other physician witnesses, and introduced 26 exhibits. Marrese was not permitted to introduce either the testimony of staff physicians who would testify to Marrese's character or letters or affidavits of anyone not available for cross-examination. The panel made these evidentiary rulings pursuant to the "Procedural Guidelines for the Fair Hearing Concerning Dr. R.A. Marrese," which specified how the panel should handle evidentiary matters anticipated to arise the Fair Hearing. The hearing panel adopted these procedures prior to the hearing, and Powell provided them to all counsel in advance.
 
 
 33
 The hearing panel issued its findings on September 7, 1983. The findings stated that Marrese had consistently performed extensive surgery in cases where the indications of need for surgery were below acceptable community standards, that Marrese had shown consistent patterns of abusive and disruptive conduct and that Marrese's practice materially endangered the health of patients and the safe provision of patient care at Deaconess. Because it thought that Marrese had demonstrated an unwillingness to cooperate with his peers, any monitoring of his surgery or conditions placed on his privileges would be insufficient to assure effective patient care. Therefore, the hearing panel recommended that Marrese's privileges be terminated. The hearing panel recommended that the MSEC suspend Marrese's privileges during the pendency of any appeal. The MSEC accepted the recommendations of the hearing panel and recommended termination to Deaconess' Board of Directors.
 
 
 34
 Marrese requested and received appellate review before the Board of Directors of Deaconess pursuant to the Fair Hearing Plan. The Board of Directors accepted the recommendation of the MSEC.
 
 C. District Court Proceedings
 
 35
 Subsequently Marrese brought this case in federal district court. The district court granted the defendants' motion for summary judgment. The district court determined that Marrese had not demonstrated a genuine issue of fact concerning the good faith of the defendants. Therefore, the court reasoned that pursuant to the immunity provisions of the Indiana Peer Review Act, the defendants could not be held liable for either tortious interference with business relations or for violations of the Indiana antitrust laws.
 
 
 36
 In his appeal to this court, Marrese attempts to shunt the immunity provision in the Act with two arguments. First, while Marrese does not dispute that the defendants are "peer review committee[s]" or persons "who furnish[ed] records, information, or assistance to a peer review committee," he insists that reasonable inferences from the record could lead a trier of fact to conclude that the defendants did not act in "good faith." Absent good faith, peer review committees or persons providing information to peer review committees could not seek refuge in the immunity provision of the Act. Absent immunity, a trier of fact could reach Marrese's claims of tortious interference with business relations and state law antitrust violations. Second, Marrese maintains that even if the immunity shields the defendants from the claim of tortious interference with business relations, the immunity does not apply to his claim based on Indiana antitrust law.
 
 II. Analysis
 A. Peer Review in Indiana
 
 37
 Indiana courts have repeatedly stated that courts must afford great deference to a private hospital's decision concerning staff privileges. E.g., Pebble v. Parkview Memorial Hosp., Inc., 536 N.E.2d 274, 275 (Ind.1989); Stiller v. La Porte Hosp., Inc., 570 N.E.2d 99, 102 (Ind.App.1991); Kiracofe v. Reid Memorial Hosp., Inc., 461 N.E.2d 1134, 1139 (Ind.App.1984). Once a court determines that the hospital has followed the procedures in the bylaws, the court will not review any decision reached by the hospital board and substitute its opinion for that of a private institution's governing authority. Stiller, 570 N.E.2d at 102; Kiracofe, 461 N.E.2d at 1139. The Indiana courts approach a dispute between a hospital and a physician over privileges somewhat like a contract claim. The court treats the bylaws and the procedures it affords like a contract setting out the rules for the parties.[8] So long as the parties have followed the rules, the court will not join the fray and attempt to second-guess a hospital in any decisions regarding medical staff privileges.
 
 
 38
 Recognizing the Indiana judiciary's abiding deference to the internal operations of private hospitals, Marrese did not go to federal district court in this case to obtain the federal judiciary's opinion of the Fair Hearing process leading to the Board's decision. Nor has he presumed that a district court judge or jury should address the appropriate indications for spinal fusion. In fact, Marrese was willing to let the Board's decision stand, but he contended that the decision and the peer review process that preceded it constituted a tort and violated state antitrust laws. Accordingly, Marrese took the defendants to federal court not to obtain reinstatement but to obtain recompense in the form of monetary damages. However, Marrese has encountered a significant impediment to his counterstrike in the Indiana Peer Review Act. Ind.Code 34-4-12.6-1 et seq.
 
 
 39
 The Indiana legislature, like other state legislatures, has charged the governing boards of hospitals with the responsibility of appointing members to their medical staffs and for managing, operating and controlling their hospitals. Ind.Code 16-10-1-6.5(a). Furthermore, it has charged hospital medical staffs with the responsibility of reviewing professional practices in the hospital for the improvement of patient care through organized committees. Ind.Code 16-10-1-6.5(b)-(c). Peer review is essential to medical competency and quality medical care in Indiana as it is in other states. Marrese v. Interqual, Inc., 748 F.2d 373, 392 (1984), cert. denied, 472 U.S. 1027 (7th Cir.1985). In furtherance of this policy and in anticipation of the "real threat of lawsuits arising from the revocation of hospital staff privileges," the Indiana legislature sought to protect the personnel involved in the medical peer review process by the qualified immunity provision of Ind.Code 34-4-12.6-3. Id. "This protection encourages competent and qualified physicians to participate in the medical peer review process, thus assuring the citizens of Indiana that hospital medical staffs are competent, qualified, and practicing in accord with the approved medical standards." Id. In short, the Indiana legislature sought to preclude precisely the type of suit that Marrese brought in district court--unless a plaintiff can show that the defendants fail to qualify for immunity.
 
 
 40
 Though broad, the immunity provided in the Act is not absolute. Under the clear language of the Indiana Peer Review Act, peer review committees and personnel cannot seek refuge in immunity if the plaintiff can show that the defendants did not act in "good faith." We must therefore consider Marrese's contention that the record is fraught with enough evidence of malice that he has at least raised a material issue of fact regarding whether the defendants are entitled to immunity and has overcome the defendants' motion for summary judgment. We will also briefly address Marrese's argument that under a recent Supreme Court case, the immunity does not apply to claims based on state antitrust law.
 
 B. Standard of Review
 
 41
 We review a district court's entry of summary judgment de novo. Therefore, we affirm a district court's summary judgment where our own review of the record reveals that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. McMillian v. Svetanoff, 878 F.2d 186, 188 (7th Cir.1989). As we review the record, we draw all reasonable inferences in favor of the non-moving party. In a diversity case, we apply our own interpretation of the applicable state law to the record and determine if there is a genuine issue of material fact. Belline v. K-Mart Corp., 940 F.2d 184, 186 (7th Cir.1991).
 
 C. Marrese's Burden on Summary Judgment
 
 42
 Both parties agree that our review of the record in this case will focus on evidence of malice and the defendants' efforts to ascertain the facts, but to guide our review, we must keep in mind how the Act allocates the burden of proof on the issue of good faith. In a motion for summary judgment, the moving party has the responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed.R.Civ.P. 56(c)). However, "[there is] no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." Id. (emphasis original). Therefore, in order to obtain summary judgment, the defendants in this case need not negate Marrese's allegations of malice. Furthermore, in a motion for summary judgment, the moving party is entitled to judgment as a matter of law if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. The Act states that "good faith [is] presumed, and malice [is] required to be proven by the person aggrieved." Ind.Code 34-4-12.6-1(f). Marrese, as the "person aggrieved," would bear the burden at trial of proving that the defendants did not act in good faith. Therefore, the defendants are entitled to judgment as a matter of law if Marrese has not pointed to specific facts on the record that tend to support his allegations of the defendants' bad faith.
 
 
 43
 We will consider Marrese's opposition to the defendants' motion for summary judgment with two principles in mind. First, to the extent that Marrese has opposed the defendants' motions by merely repeating the allegations of malice in his complaint, he has not fulfilled the requirements of Rule 56 and has failed to show the court that there is a genuine issue of material fact for trial. See Powers v. Dole, 782 F.2d 689, 695 (7th Cir.1986) (conclusory allegations that have no factual support are insufficient). Second, to the extent that Marrese has set forth facts, we will draw only reasonable inferences from those facts. To overcome a motion for summary judgment, Marrese must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In short, we are not going to divine malice from Marrese's allegations but will review carefully any facts that Marrese offers to determine whether a trier of fact could reasonably infer malice from those facts.
 
 D. Malice
 
 44
 The parties have not presented and we have found no Indiana cases that define malice in the context of peer review. An Arizona court addressing the meaning of "malice" in a statute similar to the Indiana Peer Review Act reasoned that peer review personnel act with malice if they have a "primary purpose other than the safeguarding of patients." Scappatura v. Baptist Hosp., 584 P.2d 1195, 1201 (Ariz.App.1978). At least one other state court has implicitly adopted this same definition of "malice" in the context of a peer review immunity statute. See Dworkin v. St. Francis Hosp., Inc., 517 A.2d 302, 304-305 (Del.Super.Ct.1986), appeal refused, 521 A.2d 649 (Del.1987) ("The good faith requirement ... serves to protect the medical practitioner from decisions ... which are not appropriately grounded in matters of medical competence.... There is no evidence in the record demonstrating that [the committee] ... was motivated by a purpose other than the protection of its [the hospital's] patients.") (emphasis added). The district court found that the parties had adopted through their briefs the Arizona definition of "malice." Mem.Op. at 15. In this court, Marrese and the defendants have similarly adopted this broad definition of malice, and we note that it is consistent with the purpose of the Indiana peer review statute: "to assure Indiana citizens of quality medical care and protect them from incompetent, unqualified medical treatment." Marrese v. Interqual, Inc., 748 F.2d at 392.
 
 
 45
 In addition to providing a definition of malice, the state court decisions outside of Indiana provide useful guidance on the type of specific facts that form the basis of an inference of malice. In Scappatura, the court observed the impact of the hospital environment on its evaluation of a claim of malice.
 
 
 46
 Mere allegations of malice or bad faith, even with specifications of personal animosity ... will not suffice to allow an action against the hospital personnel engaging in peer review. A hospital is a place fraught with constant pressure and emergency. In such an atmosphere, personal animosity, jealousy, anger and irritation can be expected, especially when the process of peer review is involved.
 
 
 47
 Scappatura, 584 P.2d at 1201. Similarly, in another case, the appellate court in Arizona observed that although bad faith can be inferred from circumstances, professional criticism or disapproval does not constitute malice. Gilbert v. Board of Medical Examiners, 745 P.2d 617, 627 (Ariz.App.1987); cf. Regualos v. Community Hosp., 364 N.W.2d 723, 726 (Mich.App.1984) (allegations of malice were mere conclusions and did not constitute facts showing actual malice). Since the purpose of the Indiana Peer Review Act and the immunity provision it contains closely resembles that of the state statutes at issue in the state cases cited above, we will likewise look to Marrese to show specific evidence that the defendants acted with malice. The immunity provided in the Indiana Peer Review Act plays an integral part in the scheme of peer review envisioned by the Indiana legislature, and we cannot cast it aside based on Marrese's own allegations or conclusions of malice or on anecdotes about the personal animosity that various defendants have expressed for Marrese.
 
 
 48
 We have considered Marrese's litany of "evidence" that he believes provides a sufficient basis for a trier of fact to infer malice on the part of the defendants. Our analysis will show that Marrese has failed to assemble sufficient facts to overcome the defendants' motion for summary judgment. Marrese presented a muddled assortment of allegations and conclusions with a few general references to documents in the record (often without specific page references when the documents were lengthy) and frequently mischaracterized the record on appeal. Marrese apparently believes he can win his case by sufficiently obscuring the facts rather than bringing them out. We are not enamored with Marrese's counsel's methods and remind the bar that in opposing a summary judgment motion, the litigants must point the court to specific facts. Cf. United States v. Dunkel, 927 F.2d 955, 956 (7th Cir.1991) ("A skeletal 'argument' ... does not preserve a claim [citation omitted]. Especially not when the brief presents a passel of other arguments.... Judges are not like pigs, hunting for truffles buried in briefs."). We also observe that a single fact from which we could infer malice would have been far more beneficial to Marrese than the pile of unsupported allegations and conclusions he collected. In opposing a motion for summary judgment, Marrese's mass of conclusions and allegations is worth the same as one unsupported conclusion or allegation--nothing.
 
 
 49
 Marrese begins his litany of evidence by referring to two affidavits attached to his December 26, 1989 motion for reconsideration filed pursuant to Rule 59. In his motion for reconsideration Marrese explained that he believed the affidavits had been filed with his earlier memorandum in opposition to the defendants' motion for summary judgment. The district court denied the motion for reconsideration stating that Marrese had not shown excusable neglect or other cause and that furthermore the copies of the affidavits were not notarized or dated. An appellate court will not disturb a district court's denial of a motion for reconsideration unless the district court abused its discretion. E.g., Billups v. Methodist Hosp., 922 F.2d 1300, 1305 (7th Cir.1991). Marrese does not argue in his brief before this court that the district court abused its discretion when it denied his motion for reconsideration. Marrese therefore waived the argument, and the district court's decision stands. See United States v. Hornick, 815 F.2d 1156, 1159 (7th Cir.1987) (Arguments not raised in the briefs are waived.). Accordingly, the affidavits to which Marrese refers are not properly before this court as part of the record we must consider in our review of the district court's grant of summary judgment. We will consider Marrese's other contentions in turn.
 
 1. Audit Subcommittee Review
 
 50
 Marrese next maintains that the course of the audit subcommittee's review showed malice. First, Marrese contends that audits were regularly conducted through the standing Medical Audit Committee and that the formation of the special audit subcommittee indicated something amiss. The By-Laws of the Medical and Dental Staff of Deaconess Hospital ("By-Laws") expressly permit the MSEC to form special committees as may be required. The February 8, 1978 minutes of the MSEC meetings reveal that the MSEC decided that an audit of back surgeries would be conducted through the Surgery Department. Even if this were the first time the MSEC had ever formed a special audit subcommittee pursuant to its powers under the By-Laws, Marrese can do no more than speculate that the defendants formed the special audit subcommittee for malicious reasons.
 
 
 51
 Second, Marrese maintains that his spinal fusions met the criteria in the initial fusion audit and that further review of spinal fusion cases evidenced an intent to focus on him since he was the only surgeon specializing in spinal reconstructive surgery. Regardless of whether or not Marrese's spinal fusions met the criteria in the initial fusion audit, uncontradicted evidence in the record establishes that the results of a screening audit are not conclusive as to whether the appropriate standard of care has been met. Therefore, because the audit subcommittee inquired beyond the established criteria for the spinal fusion audit to determine whether Marrese's care fell below appropriate standards, it does not follow that the audit subcommittee acted out of malice. Furthermore, Marrese's indisputable dominance in the spinal fusion market is precisely one of the factors that led the audit subcommittee to further study his spinal fusions. As defendant Evans stated at the Fair Hearing, "[i]t seemed remarkable that one surgeon should be able to find all the necessary indications for a spinal fusion in such a large number of people. When all the other orthopedic surgeons practicing at this hospital during that same length of time had only found eight people to operate on, Dr. Marrese had been able to glean up thirty-two." (Defendants' Motion for Summary Judgment, Johnson Affidavit, Fair Hearing Tr. at 218).
 
 
 52
 Marrese attempts to derive malice from the audit subcommittee's failure to further study lumbar laminectomies included in the lumbar laminectomy audit that the audit subcommittee conducted at the same time as the spinal fusion audit. Contrary to Marrese's contentions, the summary report from the lumbar laminectomy audit does not reveal that the results of the audit generated any further need for studying the lumbar laminectomies. Although there seems to be some debate regarding how many lumbar laminectomies satisfied the audit criteria as compared to how many spinal fusions passed the audit, this dispute does not help Marrese. Even if a lower percentage of lumbar laminectomies than spinal fusions met the criteria of their respective audits, the decision of the audit subcommittee to further study only spinal fusions would not tend to establish that the audit subcommittee was motivated by something other than patient welfare. As the defendants explained, and Marrese has not disputed, the audit criteria are not the sole criteria by which the appropriateness of patient care is measured. While the audit subcommittee noted after the lumbar laminectomy audit that certain documentation needed improvement, it did not find any indications for further study of the care provided by the physicians who conducted the lumbar laminectomies. By contrast, the spinal fusion audit summary did indicate that some areas needed further study. Nothing in these audit summaries and the audit subcommittee's subsequent course of action raises a genuine issue of material fact regarding malice.
 
 
 53
 The audit subcommittee met only once with Marrese and managed to discuss only one of the 32 cases from 1977-78 that had been audited. Marrese claims that this contravened the "collegiality and counseling components of peer review properly conceived, and impl[ies] a motive other than patient welfare." (Appellant's Brief at 43). A brief review of the transcript of the meeting between Marrese and the audit subcommittee reveals that Marrese personally attacked committee members and insisted on haggling over why the committee members had not come to him without going to the MSEC. Since Marrese effectively precluded any discussion about the cases under study, it is no wonder that the audit subcommittee did not come back for more. A reasonable trier of fact would be hard pressed to conclude that the audit subcommittee's failure to subject itself to another futile round of talks with Marrese indicated malice on the part of the audit subcommittee. If anything, the transcript evidences the audit subcommittee's efforts to be fair to Marrese. For example, near the end of the meeting, Marrese suggested that an outside audit be conducted and that Bryant A. Bloss, M.D., be added to the audit subcommittee. When Rabin left town, the Surgical Control Committee appointed Bloss and Pedro Dominguez, M.D., to the audit subcommittee.
 
 2. Failure to Suspend Privileges
 
 54
 Marrese points out that the defendants took no action to prevent or restrict him from performing surgery until the conclusion of the internal review of the Fair Hearing in September 1983 and maintains that this tends to negate the defendants' claim that they were motivated by their concern for patient welfare. Summary suspension of a physician or restrictions on his privileges are options under the Medical Staff By-Laws, but the MSEC's decision to exercise that option is discretionary and requires medical judgment. We would effectively abrogate that discretion if a failure to take immediate action alone was evidence of malice since hospital medical staffs would summarily suspend a physician or restrict his privileges before a Fair Hearing just to bolster its contention that it acted in good faith. The reasons why the MSEC did not take immediate action calls for significant speculation. In fact, the sparse evidence in the record pertaining to why no restrictions were placed on Marrese suggests that the defendants were making every effort to be fair to Marrese. The decision to suspend a second opinion requirement until after Marrese had met with the audit subcommittee, for example, indicates an effort to allow Marrese an opportunity to explain his surgical practices and serves to negate any inference that the defendants were "out to get" Marrese apart from any concern for patient welfare.
 
 3. Absence of Patient Complaints
 
 55
 The absence of patient complaints and the failure of defendants to interview or examine patients or allow patient testimony at the Fair Hearing does not tend to prove malice as Marrese suggests. Even if every patient had a perfect outcome, it does not follow that the surgeries were medically justified and performed in conformity with appropriate standards of care. Moreover, patients are not qualified to assess the professional standard of care. Therefore, the lack of patient interviews or testimony does not tend to establish malice on the part of the defendants.
 
 4. Rapp's Report and the InterQual Study
 
 56
 Marrese argues that the defendants evinced malice by failing to implement any of Dr. George Rapp's suggestions made in his February 2, 1982 letter, such as hiring an outside national firm to conduct a comparison of standards. Instead, defendants retained InterQual and continued to argue for revocation at the Fair Hearing after admitting the deficiencies of the InterQual audit. By retaining InterQual, however, the defendants were attempting to implement Rapp's suggestions to some degree. While Rapp did not suggest InterQual specifically, he did recommend that a national firm be employed to conduct a review of Marrese's surgeries, and InterQual constitutes an national firm. The defendants did not adopt Rapp's proposal to set up a review by experts chosen by Marrese and the defendants. While that fact alone might suggest that the defendants wanted to keep Marrese from upsetting some conspiracy they were conducting to get rid of Marrese, its significance pales in light of the substantial evidence that the defendants made substantial efforts to be fair to Marrese. The defendants offered to allow a Fair Hearing panel of independent physicians from the University of Indiana, but Marrese declined. Furthermore, Marrese was permitted to present his own expert testimony at the Fair Hearing. In light of such obvious efforts to be fair, a reasonable trier of fact could not likely find malice based on speculation as to why the defendants chose to follow Rapp's suggestions as they did.
 
 
 57
 While the InterQual study contained inaccuracies[9], Marrese does not suggest that any action on the part of the defendants caused the inaccuracies. The record indicates that the results of the InterQual audit spurred the action taken by the MSEC, but the record does not indicate that it was the sole evidence upon which the MSEC relied in revoking Marrese's privileges. Therefore, the subsequent decision not to present the defective InterQual study at the Fair Hearing while continuing to press for revocation of Marrese's privileges does not tend to establish that the defendants had an ulterior motive in proceeding against Marrese. On the contrary, it tends to show no more than that the defendants concluded they could show that Marrese did not meet the appropriate standard of care even without the InterQual study.
 
 5. Fair Hearing
 
 58
 Marrese infers malice from several aspects of the Fair Hearing. First, he states that the hearing panel refused to admit evidence of Marrese's experts concerning the high quality and appropriateness of the 1980 surgeries at issue in the InterQual report. However, Marrese does not make any reference to the record to indicate that he proffered such evidence. Moreover, since the panel did not use the InterQual report, the 1980 surgeries were not in evidence against Marrese, and discussion about them would have been irrelevant. Second, Marrese maintains that although he called experts in his defense, because defendants did not call any "independent experts" but only "competing neurosurgeons and orthopedists" the proceedings were not objective and the defendants did not make reasonable efforts to ascertain the facts. In order to accept Marrese's reasoning, we have to assume that the element of competition between competing physicians negates their ability to evaluate one another objectively and conclude that if the defendants really had a case against Marrese, they would have recognized the worthlessness of the testimony of competing physicians and brought in outside experts. This assumption and resulting conclusion are invalid. The existence of competition between colleagues is a factor that the physician under scrutiny is likely to exploit in an effort to diminish the weight of a competing physician's testimony. Indeed, in his cross examination, Marrese emphasized the element of competition between himself and the physicians testifying at the Fair Hearing in order to undermine the credibility of the physicians. The element of competition between competing professionals, however, does not automatically nullify their ability to objectively evaluate one another. Without more specific evidence of malicious motives, the defendants' choice of witnesses amounts to no more than a tactical decision that the element of competition between the physicians would not be sufficient to undermine the weight of the evidence the defendants presented against Marrese.
 
 6. Amendment of Charges
 
 59
 Marrese discerns malice in the defendants' amendment to the charges pending against him two months before the Fair Hearing. According to Marrese, the defendants added the unprofessional conduct charges because they realized that by abandoning the cases in the InterQual study and reverting to the cases that had initially raised the audit subcommittee's concerns, the defendants were conceding the weakness of their case against Marrese and needed the new allegations to bolster their charges. However, Marrese admitted in the settlement agreement with Deaconess that he removed x-rays from Deaconess, and he admitted in a letter to the hearing panel that he verbally abused at least one member of the medical staff. Since Marrese cannot contest the truth of the matters on which the MSEC based its charges of unprofessional conduct, Marrese is arguing that despite their truth, amending the charges itself presupposes malice. Without any more than Marrese's speculation, we cannot agree. Superseding indictments are common in criminal law and do not indicate malice so much as a discovery of new evidence. Amending the charges against Marrese two months before the Fair Hearing to encompass charges based on his conduct subsequent to the first charge letter does not by itself presuppose malice.
 
 7. Exclusion of Evidence
 
 60
 Marrese insinuates that LaCava and Powell engaged in a conspiracy to compromise his defense by excluding testimony of staff physicians, excluding affidavit or sworn statements and adopting a special burden of proof for his case. To support these allegations, Marrese refers generally to correspondence between LaCava and the members of the audit subcommittee in preparation for the Fair Hearing without explaining how that correspondence shows any improper behavior on the part of defendants. In his letters, LaCava simply discusses the evidence that he would introduce on behalf of the defendants and speculates as to the admissibility of evidence that Marrese's list of exhibits and witnesses indicated he would introduce. There is no indication that the defendants plotted to improperly interfere with Marrese's efforts to introduce admissible evidence. The exclusion of affidavits and sworn statements under the Procedural Guidelines for the Fair Hearing conformed to the Fair Hearing Plan's provision that "the parties shall have the right to ... (c) cross-examine any witness...." (Appellees' Brief, Supplemental Appendix at 340-41). Likewise the defendants did not adopt the burden of proof uniquely for Marrese's hearing. The Fair Hearing Plan establishes the burden on Marrese. Marrese has not gone so far as to suggest that the entire Fair Hearing Plan was adopted as part of a grand conspiracy to drive him out of Deaconess. Therefore, complying with the Fair Hearing Plan is hardly evidence of malice.
 
 
 61
 Marrese states that the defendants prevented him from introducing evidence of the standard of care of other surgeons performing the same procedures over the same time period. If the statement were true, Marrese might have something. But Marrese blatantly misrepresents the record. Michael Treister, M.D., and Robert Bingham, M.D., both testified as to how Marrese's care compared to the standard of care at the time he performed the spinal fusions at issue. (Defendants' Motion for Summary Judgment, Johnson Affidavit, Fair Hearing Tr. at 505 and 625). Marrese provides no reference to the record to show where the defendants excluded any similar expert testimony.
 
 
 62
 In sum, Marrese has shown nothing in the record that demonstrates malice on the part of any defendant.
 
 B. Claim Under State Antitrust Law
 
 63
 In one last ditch effort to save at least part of his case, Marrese maintains that even if immunity shields the defendants from his tort claims, it does not apply to his state law antitrust claims. Marrese arrives at this curious conclusion based on Patrick v. Burget, 486 U.S. 94 (1988). Marrese's reliance on Patrick is completely misplaced and demonstrates a total lack of understanding of Patrick's holding.
 
 
 64
 In Patrick, the Supreme Court held that state action immunity did not protect Oregon physicians from federal antitrust liability for their activities on hospital peer review committees. The plaintiff in Patrick had brought an action charging that certain physicians had violated §§ 1 and 2 of the Sherman Act by initiating and participating in peer review proceedings to reduce competition from the plaintiff rather than to improve patient care. The plaintiff won his case in federal district court, but the Court of Appeals for the Ninth Circuit reversed, holding that the conduct of the defendants fell within the state action exemption from antitrust liability because Oregon had a policy in favor of peer review and supervised the peer review process. The Supreme Court turned to the "rigorous two-pronged test" it had established in California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97 (1980), for determining whether anticompetitive conduct engaged in by private parties should be deemed state action and thus shielded from antitrust laws. Patrick, 486 U.S. at 99. Under the second prong of that test, the anticompetitive conduct "must be 'actively supervised' " by the state. Id. (quoting Midcal, 445 U.S. at 105). The Court reasoned that although Oregon's Health Division had general supervisory powers over hospitals and hospitals in Oregon had a statutory obligation to establish peer-review procedures, the state did not actively supervise peer review decisions because no state official had ultimate authority over hospital privilege determinations. Id. at 102. Since the case failed the "active-supervision" prong of the test, the state action exemption from the Sherman Act did not apply. Id. at 100.
 
 
 65
 The immunity in this case is not based on state action, and Marrese's antitrust claims are not based on federal antitrust law but on Indiana antitrust law. Indiana has clearly articulated a broad grant of immunity by providing that "no action of any nature" shall arise-against the personnel of a peer review committee for their communications or their determination made in the context of peer review proceedings conducted in good faith. Ind.Code §§ 16-10-1-6.5(d) and 34-4-12.6-3. The Indiana legislature has not seen fit to except antitrust actions based on state law from its broad grant of immunity, and this court has no basis for interfering with its decision.
 
 III. Conclusion
 
 66
 Marrese has now come before this court twice with matters related to the revocation of his privileges and has similarly badgered the Indiana state courts. We are disturbed not so much by the frequency with which Marrese appears before us as by his counsel's manner of presentation which has consumed this court's time while other litigants with legitimate claims have stood in line. Because counsel frequently failed to cite the record or otherwise substantiate allegations, this court undertook an essentially fruitless search. Under these conditions, Marrese got a much more thorough review than his brief merited. In spite of Marrese's efforts to concoct a genuine issue of material fact by misrepresenting the record and amassing unsupported conclusions and allegations, we have found no genuine issue of material fact for trial. Accordingly, the district court's grant of summary judgment for the defendants is
 
 
 67
 AFFIRMED.
 
 
 68
 HERBERT L. WILL, Senior District Judge, concurring.
 
 
 69
 While I ultimately join in affirming the grant of summary judgment, I write separately to stress my concern about certain aspects of the review process that was followed in the case of Dr. Marrese.
 
 
 70
 I agree with the majority that Dr. Marrese has not come forward with any direct evidence of malice. However, the sequence of events involving the use and then abandonment of the InterQual report provides more support for an inference of malice than the opinion acknowledges.
 
 
 71
 Dr. Rapp had recommended that the hospital examine the concerns raised by the original internal audit committee by retaining an outside expert, a national firm. Although the hospital had retained InterQual, when the Fair Hearing Committee revoked Marrese's privileges, its decision was not based on the in-depth review by an outside expert, like InterQual, which Dr. Rapp had recommended. Essentially, the hospital (1) raised questions about the initial audit, (2) decided they wanted more information before making a decision, (3) retained InterQual, and (4) had one committee recommend termination based on the InterQual report. Then, one year later, the hospital agreed that the InterQual report was too flawed to rely upon, and made the final termination decision based on the original internal audit which, when it was first made, was only deemed adequate to justify further investigation, not a final decision.
 
 
 72
 This chain of events gives some support to the inference that the hospital had its mind made up, and was going to revoke Marrese's staff privileges regardless of what the evidence showed--in short there is some basis for an inference of malice. The same evidence would support an inference that the hospital had sufficient evidence to revoke Dr. Marrese's privileges based on the initial audit, and merely did further investigation in order to be more fair to him. The fact that they offered to have the final hearing panel chosen from independent physicians from the University of Indiana rather than doctors associated with the hospital shows both fairness to Dr. Marrese and confidence that the evidence they were relying on did support revocation of his privileges.
 
 
 73
 While we are not to weigh the evidence or decide which of two inferences is more compelling, we must view the evidence and inferences presented by Marrese in light of his burden at trial. Anderson v. Liberty Lobby, 477 U.S. 242, 255, 252 (1986). In this case Marrese would have had to show "malice," defined as having a "primary purpose other than the safeguarding of patients." Given this standard, I cannot say that Marrese has met his burden. That some participants in the peer review process may have had a secondary purpose other than safeguarding patients, or have had personal animosity toward Dr. Marrese is not sufficient. The record as a whole shows that there were objective reasons to be concerned about patient care, and that there were also attempts to be fair to Dr. Marrese. There is just not enough evidence to support an inference or a jury verdict of malice.
 
 
 
 *
 Hon. Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation
 
 
 [1]
 The Act defines "peer review committee" as follows:
 (c) [As used in this chapter, "peer review committee" means] ... a committee having the responsibility of evaluation of qualifications of professional health care providers, or of patient care rendered by professional health care providers, or of the merits of a complaint against a professional health care provider that includes a determination or recommendation concerning the complaint. The committee must meet the following criteria....
 Ind.Code 34-4-12.6-1(c).
 The Act defines "personnel of a peer review committee" as follows:
 (e) [As used in this chapter, "personnel of a peer review committee" means] ... not only members of the committee but also all of the committee's employees, representatives, agents, attorneys, investigators, assistants, clerks, staff, and any other person or organization who serves a peer review committee in any capacity.
 Ind.Code 34-4-12.6-1(e).
 
 
 [2]
 Marrese stated in his Statement of Facts that "plaintiff alleged [that] the SAHC [audit subcommittee], even though plaintiff's spinal fusion cases ... met all nationwide and areawide quality criteria, elected to re-examine those cases using no established audit criteria." (Marrese's brief at 7). This is a perfect example of Marrese's repeated use of allegations in his Statement of Facts without reference to supporting evidence in the record. We cannot find that the parties have a dispute as to material facts if we cannot verify that the parties have support in the record for their version of the facts
 
 
 [3]
 InterQual, Inc. defines itself as "Consultants, Educators and Publishers to Health Care Providers."
 
 
 [4]
 Deaconess and Marrese settled the suit on February 17, 1983. Marrese acknowledged in the settlement agreement that the x-rays were the sole property of Deaconess
 
 
 [5]
 The notice alleged that Marrese's behavior had been characterized by "belligerent, disruptive, and inappropriate conduct" that jeopardized the orderly and harmonious operation of the hospital and occasionally disrupted the orderly and safe provision of medical care to patients. The notice went on to specify incidents in which Marrese demanded rescheduling for his patients in violation of the rules in the Department of Surgery, abused and insulted hospital staff, and obstructed the peer review process by taking patient x-rays and refusing to return them to the hospital for use in the peer review process until Deaconess filed suit to obtain them. (Appellees' Brief, Supplemental Index at 277-78.)
 
 
 [6]
 Before the Fair Hearing, Marrese objected to the panel's choice of one of Marrese's former attorneys (who had represented him in matters unrelated to the peer review proceedings), William D. Powell, for consultation on matters of procedure. Powell advised the panel on procedural matters in spite of Marrese's objections but did not participate in the deliberations of the panel or its decision. As a member of Deaconess' Board of Directors, Powell did not participate in the Board's deliberations or final decision. In his appeal, Marrese contends that Powell corresponded with LaCava in a way that suggests a conspiracy against Marrese but does not argue that Powell's role as an advisor to the panel indicates bad faith
 
 
 [7]
 Marrese unsuccessfully sought to enjoin the hearing in state court. The state court judge found insufficient evidence of malice to warrant injunctive relief
 
 
 [8]
 In fact, the Indiana courts, like several other state courts, have recognized that hospital medical staff bylaws can constitute a contract between the hospital and its medical staff. Pebble v. Parkview Memorial Hosp., 536 N.E.2d 274, 276 (Ind.1989); Terre Haute Regional Hosp., Inc. v. El-Issa, 470 N.E.2d 1371, 1377 (Ind.App.1984)
 
 
 [9]
 While the earlier audit had reviewed 1977-78 cases, the InterQual study focused on 1980 cases